**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **EXPOTECH ENGINEERING, INC.,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | |
| **CARDONE INDUSTRIES, INC.,** | **NO. 19-1673** |
| **Defendant/Counterclaim Plaintiff,** | |
| **v.** | |
| **EXPOTECH ENGINEERING, INC.,** | |
| **ROD GHANI, MARSHALL HOSEL** | |
| **Counterclaim-Defendants.** | |

## MEMORANDUM OPINION

This case is about a business deal gone sour – and then some. It stems from an agreement that Defendant Cardone Industries, Inc. entered into with SAP America, Inc. whereby SAP was to provide Cardone with Enterprise Resource Planning ("ERP") software, systems and technology. Cardone sought vendors to assist it with its implementation and chose Plaintiff, Expotech Engineering, Inc.. In February 2016, Cardone and Expotech entered into a Consulting Services Agreement ("CSA") whereby Expotech was to provide the agreed upon services and Cardone was to pay for those services. That is, alleges Expotech, until Cardone, did not.

In a one count breach of contract lawsuit, Expotech claims that Cardone owes it north of a million dollars. This opinion is not, however, about that single breach of contract claim. Rather, it concerns the Counterclaim Cardone has brought against Expotech, Rod Ghani (Expotech's principal as well as its sole shareholder), and Marshall Hosel (who was Cardone's Vice President of Finance at the time the CSA was negotiated and signed). Unbeknownst to Cardone, Hosel and Ghani knew each other before Cardone and Expotech began negotiating the CSA; the two conducted business transactions with each other in the past and companies at

1

which Hosel previously held management positions had contracts with Expotech. Cardone alleges that Hosel understood Expotech was not qualified to perform the CSA, but aggressively championed for it to receive the contract because he was bribed by Expotech and Ghani to do so. Over the course of two years, Expotech deposited $817,762.92 into Hosel's bank account.

The allegations in Cardone's Counterclaim involve a commercial bribery scheme, portray Expotech as a sham corporation for Ghani's monetary benefit, describe Ghani commingling his affairs with Expotech and his many business entities, and contend that Expotech misrepresented its ability to handle the SAP ERP implementation project, failed to perform the work that it had agreed it would do, and stopped work on the project before the work was completed.

In its Counterclaim, Cardone sues Expotech for two counts of breach of contract, as well as claims for breach of warranty of workmanlike performance, breach of warranty of merchantability, and breach of fiduciary duty and seeks a declaratory judgment against Expotech.[1] It also sues Expotech, Ghani, and Hosel for unjust enrichment, conversion, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and for a conspiracy to violate RICO, as well as for civil conspiracy. Cardone also filed a separate lawsuit against Hosel (now consolidated with this case and arising from the same set of interactions) setting forth two counts of breach of contract, as well as counts for fraud in the inducement and breach of fiduciary duty.

Expotech and Ghani ("Counterclaim Defendants") jointly move to dismiss all counts of the Counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6). Hosel moves under Rule 12(b)(6) to dismiss all counts made in the Counterclaim against him, moves under Rule 12(e) for a more definite statement of the RICO counts, and moves under Rule 12(b)(6) to dismiss the

---

[1] Cardone brings all claims against Expotech against Ghani as well, under a theory of alter ego liability. Some of the claims are also brought against Ghani in his individual capacity, apart from alter ego liability.

fraud in the inducement and breach of fiduciary duty counts from Cardone's Complaint against him.

## I.    LEGAL STANDARD

To survive a motion to dismiss, the Counterclaim must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted).  The claims are construed in the light most favorable to the non-moving party.  *Warren Gen. Hosp. v. Amgen, Inc.*, 643 F.3d 77, 84 (3d Cir. 2011).  Factual allegations must be separated from legal conclusions and recitations of the element of the claim, as legal conclusions are not sufficient to state a plausible claim.  *Iqbal*, 556 U.S. at 678.  At the motion to dismiss stage, all well-pleaded allegations in the Counterclaim are accepted as true and all reasonable inferences are drawn in favor of Cardone, the non-moving party.  *See In re Rockefeller Ctr. Properties, Inc. Sec. Lit.*, 311 F.3d 198, 215 (3d Cir. 2002). Thus, the pleading standard on a motion to dismiss is favorable to the non-moving party which has not yet had the benefit of discovery.  Accordingly, "a well-pleaded [counterclaim] may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).[2]

---

[2] Despite the Supreme Court's explicit guidance that the "plausibility standard is not akin to a 'probability requirement,'" *Iqbal*, 556 U.S. at 678, Expotech essentially requests the implementation of such a requirement in the form of what it calls the "obvious alternative explanation" rule.  In *Twombly*, the Supreme Court explained that there was an "obvious alternative explanation" to the Plaintiff's antitrust theory: at the time in question, monopoly was the norm, not the exception. *Twombly*, 550 U.S. at 567-68.  In light of the clear non-sinister explanation, the Court found Plaintiff's threadbare allegations of conspiracy to be implausible.  *Id.*  Likewise in *Iqbal*, although the allegations in the complaint could be consistent with discriminatory detention, given the context of the detainments occurring in the aftermath of the September 11 attacks and the need to ensure no other terrorists posed a threat to the country, this latter far more likely explanation made Plaintiff's allegations not plausible.  *Iqbal*, 556 U.S. at 682. The Supreme Court did not, accordingly, establish in either of the two cases, an additional component to the pleading standard.  Rather it discussed obvious alternative explanations in the context of evaluating the plausibility of the allegations in the complaint in the context in which they were made.  *Twombly*, 550 U.S. at 567-68; *Iqbal*, 556 U.S. at 679.

## II.    ANALYSIS

### A.  Piercing the Corporate Veil

As a preliminary matter, Cardone contends that Expotech is a "mere façade" designed to mislead potential customers about Expotech's qualifications in order to win contracts it is not equipped to perform.  It alleges that neither Ghani nor Expotech's employees have sufficient skill related to SAP implementation, which is what they were hired to perform.  According to Cardone, Expotech did not even receive its SAP certification until after it received the CSA.  And despite representations otherwise, Expotech has never performed an SAP implementation project of the size and scope of that which was set forth in the CSA.

Counterclaim Defendants seek dismissal of any counts against Ghani premised on this theory, arguing that the veil piercing allegations are insufficient to pass muster on a motion to dismiss standard.

 Although it is "notoriously difficult" to pierce the corporate veil, *Pearson v. Component Tech. Corp*., 247 F.3d 471, 485 (3d Cir. 2001), Cardone proposes that this is one of those rare sets of circumstances where it is must be done.  The corporate form was created to allow shareholders to invest in companies without incurring personal liability for the corporation's actions.  *Id.*  "The 'classical' piercing of the veil is an equitable remedy whereby a court disregards the existence of the corporation to make the corporation's individual principals and their personal assets liable for the debts of the corporation."  *Trustees of Nat. Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 192 (3d Cir. 2003) (*citing In re Blatstein,* 192 F.3d 88, 100 (3d Cir. 1999)).  This only occurs when it is necessary to "prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime," *Pearson*, 247 F.3d at 485, and "the debtor

4

corporation is little more than a legal fiction." *Lutyk*, 332 F.3d at 194.

A holistic, fact-specific inquiry into multiple factors – in Pennsylvania, those factors include: "gross undercapitalization, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation, siphoning of funds from the debtor corporation by the dominant stockholder, nonfunctioning of officers and directors, absence of corporate records, and whether the corporation is merely a facade for the operations of the dominant stockholder,"[3] *Pearson*, 247 F.3d at 484-85 – must be made.[4]

### 1. *Corporate Formalities*

Although failure to observe corporate formalities, such as holding scheduled meetings and keeping accurate records, generally weighs in favor of piercing the veil, *see E. Minerals & Chems. Co. v. Mahan*, 225 F.3d 330, 333 n.7 (3d Cir. 2000), when the entity at issue is a closely held corporation, informalities are considered to be of less importance. *Zubik*, 384 F.2d at 271 n.4. Cardone makes several allegations related to Expotech's purported failure to observe formalities. Expotech's principle place of business is identified as Ghani's home address in Arizona (which is also the principle place of business for sixteen other limited liability companies in which he has an ownership interest), even though Expotech is not licensed to do

---

[3] Expotech alleges that, despite the existence of a choice-of-law provision in the governing contract agreeing to litigate disputes under Pennsylvania law, the alter ego claim could potentially be governed by Ohio law, the state in which Expotech is incorporated. However, neither party provides any briefing on the matter. Pennsylvania law will thus be applied on this motion to dismiss.

[4] Cardone and Expotech go back and forth on what they think the correct legal standard is for analyzing alter ego claims – either by a simple preponderance of evidence or by clear and convincing evidence. *Compare Zubik v. Zubik*, 384 F.2d 267, 270 n.2 (3d Cir. 1967) (requiring a preponderance of the evidence) *with Kaplan v. First Options of Chicago, Inc*., 19 F.3d 1503, 1522 (3d Cir. 1994) (analogizing alter ego claims to fraud claims and thus requiring a heightened showing of clear and convincing evidence). However, neither of the cases relied upon by the parties are apposite to the present motion to dismiss, as both cases address the *evidentiary* requirement for a party to prove the corporate veil should be pierced, not the pleading requirement. *Zubik*, 384 F.2d at 269 (appealing judgment from admiralty court); *Kaplan*, 19 F.3d at 1522 (appealing arbitration award). Neither party points to any case holding that the *pleading* requirement for an alter ego claim is anything beyond the standard plausibility requirement.

business in Arizona.  Further, Expotech's registered corporate address remains Ghani's former residence in Ohio, which was sold in 1996.[5]  Next, Ghani is the only officer or director of Expotech.  And, Expotech does not hold shareholder meetings or otherwise keep proper corporate records.

But, if Expotech is an Ohio corporation, it complies with Ohio law that permits a closely held corporation to dispense with annual shareholder meetings.  *See* Ohio Rev. Code Ann. § 1701.591(C)(12).  And, if Pennsylvania law applies to this issue, as the CSA suggests it does, despite Ghani being the sole stockholder, it would still typically be viewed as an independent entity under Pennsylvania law.  *Lumax Indus., Inc. v. Aultman*, 669 A.2d 893, 895 (Pa. 1995). And as a closely held corporation, the informalities are of less importance.  *Zubik*, 384 F.2d at 271 n.4.

Nevertheless, Cardone's allegations related to corporate formalities do some work in determining whether to pierce the veil.  Even though Ghani is not required to hold shareholder meetings or have a functioning board of officers, the alleged slippage regarding where Expotech is registered and where it is authorized does raise an eyebrow.

### 2.  *Intermingling and Siphoning Funds*

Cardone makes numerous allegations related to intermingled funds.  In December 2016, Expotech transferred $1.5 million from its checking account to a securities brokerage and investment advisory services firm – which funds were not reported on either Expotech's or Ghani's tax returns in 2016 or 2017.  Throughout 2016 and 2017, Expotech made three payments totaling $1.8 million to an insurance company for property related to one of Ghani's other businesses.  In May 2017, Expotech made two payments totaling $25,000 described as "Resale-

---

[5] Cardone also alleges that in 2009, the Ohio Secretary of State cancelled Expotech's Articles of Incorporation and Certificate of Authority for failing to file necessary corporate franchise tax reports or pay any such taxes within the time prescribed by law.

Tempe Maaco." Tempe Maaco is the name of one of Ghani's businesses. In June 2017, Expotech paid $1.3 million from its checking account to a title agency for property that belongs to another of Ghani's businesses. In September 2017, Ghani sold an Ohio property, listed the sale on his personal tax returns, then deposited the proceeds into Expotech's checking account. Cardone alleges other similar transactions where Ghani paid money from Expotech's account directly to his other businesses throughout 2018 as well. Cardone further alleges numerous instances of what appears to be Ghani using Expotech's funds for purely personal ventures. For example, there are deposits into Expotech's accounts from vacation rental companies Homeaway and AirBnB. There are also monthly payments from the account to Chase Auto Finance. And, Expotech also paid over $100,000 to purchase two vehicles, a 1965 Ford Mustang and a 2018 Mercedes GT C Roadster.

While Ghani is permitted to observe fewer formalities with his closely held corporation, that does not give him free rein to intermingle personal and business ventures as he sees fit – Cardone's allegations plausibly reflect a "a lack of respect for the corporate form and of [Expotech] as a separate entity." *Lutyk*, 332 F.3d at 196. *See also Plastipak Packaging, Inc. v. DePasquale*, 75 F. App'x 86, 89 (3d. Cir. Sept. 12, 2003) (per curiam) (weighing Defendant's use of corporate funds to pay insurance for other properties in his name and transferring money between various corporate and business accounts in favor of piercing the veil); *Lumax*, 669 A.3d at 895 ("[S]ubstantial intermingling of corporate and personal affairs" may, in part, justify piercing the corporate veil.).

### 3. *Capitalization and Solvency*

Cardone next alleges that Expotech has made representations that it cannot pay its debts and is, thus, undercapitalized. Inability to pay debts, however, is not the same as

undercapitalization. *Lutyk*, 332 F.3d at 196. Capitalization focuses on the funds in the company's account when it was *formed*; this inquiry is most useful for the "inference it provides into whether the corporation was established to defraud its creditors or other improper purpose such as avoiding the risks known to be attendant to a type of business." *Id.* at 197. Cardone makes no allegations as to Expotech's capitalization when it was formed.

However, Cardone's allegations about Expotech's inability to pay debts remain relevant to the analysis. Specifically, Cardone alleges that, in the summer of 2018, Expotech transferred over $2.5 million out of its accounts (at least $1.3 million of which was transferred directly to Ghani), which rendered the company "insolvent." Insolvency or shortage of capital is not a *per se* reason to pierce the veil. *Lutyk*, 332 F.3d at 197. For example, when a company is simply hit by an economic downfall or makes poor business decisions, its shortage of capital may be of less probative value. *Cf. Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1523 (3d Cir. 1994). But Cardone alleges that Ghani and Expotech intentionally drained $2.5 million out of Expotech's account, and then represented that it was because of Cardone that it could not pay creditors. These allegations plausibly support an inference that Expotech's purpose is to defraud creditors and protect Ghani's assets. *See Lutyk*, 332 F.3d at 197.

\*\*\*

Cardone's allegations that Expotech is merely the alter ego of Ghani are sufficient to permit it to further develop its alter ego claims through discovery, *see Trett Texas LLC v. Pitney Road Partners, LLC*, 2015 WL 5737571, at \*3 (E.D. Pa. Sept. 30, 2015), in that they are supported by names, dates, and examples of Ghani's purported lack of respect for the corporate form moving well beyond conclusory recitation of the elements of relief. *Iqbal*, 556 U.S. at 678.

### B. Counts I and II: Breach of Contract

Cardone's Counterclaim alleges two counts of breach of contract. The first is premised on Expotech's order to its independent contractors to stop working on the job in July 2018 while numerous issues with the project's implementation remained outstanding. The second claim is that, by filing a lawsuit and copyright application in Arizona alleging that Cardone was infringing on Expotech's ownership of copyrighted software, Expotech breached provisions of the CSA providing that all software and product developed by Expotech in connection with the project would be the sole and exclusive property of Cardone.

In seeking to dismiss the first count, Expotech argues that Cardone's contract claim must fail because it was Cardone, not Expotech, that first breached the CSA when it stopped paying in April 2018, and then failed to honor the contract's cure provision.[6] But at the motion to dismiss stage, all that can be considered are "allegations contained in the [counterclaim], exhibits attached to the [counterclaim] and matters of public record." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Expotech sees the deterioration of the parties' agreement differently than Cardone and has set forth its understanding in the allegations of its Complaint. But on this motion to dismiss the Counterclaim, the Court considers only the Counterclaim allegations that Expotech breached the contract by pulling its independent contractors from the project and that, following the breach, Cardone sent a notice and cure letter terminating the contract that outlined the issues and provided Expotech an opportunity to cure them, to which Expotech did not respond. Cardone has sufficiently alleged its first breach of

---

[6] The cure provision, found in Section 6 of the CSA, reads:

> The Client may terminate this Agreement for any reason with a thirty (30) day notice or immediately for "Cause," after giving [Expotech] written notice of the reason. Cause means: (1) ET has materially breached a provision of this Agreement in any respect, and the breach continues for ten (10) days following receipt of a notice from the Client. . . .

contract count.

Turning to Cardone's second breach of contract count, Cardone focuses on a lawsuit filed against it by Expotech in Arizona in 2019 which included a claim for copyright infringement. Attached to that complaint was Expotech's application for a copyright for software developed under the CSA. According to Cardone's Counterclaim, the CSA provides that all software developed by Expotech in connection with the CSA would be the sole and exclusive property of Cardone and that Cardone's ownership of the intellectual property survived the termination of the CSA. Cardone alleges that Expotech breached the CSA by demanding that Cardone cease and desist using computer software developed by Expotech in connection with the CSA; by filing the copyright infringement claim against Cardone in the Arizona action; and by applying to register a copyright for intellectual property owned, pursuant to the CSA, by Cardone.

Expotech argues that this claim must be dismissed because filing the Arizona complaint was protected activity and the copyright was not infringed. *Anderson v. Davila*, 125 F.3d 148, 161 (3d Cir. 1997). Certainly, filing a lawsuit, so long as it is not frivolous, is protected under the First Amendment. *Id.* Thus, the mere filing of a lawsuit does not represent a breach of the contract. Further, there is no indication – one way or the other – whether the Arizona lawsuit was frivolous. Taking judicial notice of the Arizona court's dismissal of the matter on personal jurisdiction grounds, with no adjudication on the merits, *Expotech Eng'g Inc. v. Cardone Indus. Inc.*, 2019 WL 1043269 (D. Ariz. Mar. 5, 2019), the Counterclaim contains insufficient allegations to support a conclusion that the complaint was frivolous. Accordingly, to the extent that the second breach of contract count depends on the Arizona lawsuit, it shall be dismissed.

Not so with respect to Expotech's copyright application. It is unclear from the pleadings the status of Expotech's application – however, if the application is successful and copyright is

registered, such registration would entitle Expotech to a rebuttable "presumption of validity" for its claim were any future copyright disputes to arise. *See United Fabrics Int'l, Inc. v. C&J Wear, Inc.*, 630 F.3d 1255, 1257 (9th Cir. 2011); *see also* 18 U.S.C. § 410(c). Taking all inferences in Cardone's favor, an application seeking to create an automatic (although rebuttable) presumption in favor of Expotech's claim to copyright may represent a breach of the CSA's copyright provisions, which state that Cardone shall hold the copyright. Expotech's motion to dismiss the second breach of contract claim, to the extent it is premised on the copyright application, shall accordingly be denied.

The ad damnum clause in each of Cardone's breach of contract claims requests "consequential damages" which, Expotech argues, are unavailable to Cardone. It goes further to seek dismissal of requests for "tort-like, punitive" damages. However, as Cardone readily owns, it is not seeking "tort-like" or "punitive" damages for its breach of contract claims so there is no need to address Expotech's arguments in that regard. Cardone is, however, seeking consequential damages and, if it succeeds on its breach of contract claims, it is entitled to them to the extent that they are not prohibited by the contract and provided that: "(1) they were such as would naturally and ordinarily result from the breach; or (2) they were reasonably foreseeable and within the contemplation of the parties at the time they made the contract, and (3) they can be proved with reasonable certainty." *Taylor v. Kaufhold*, 84 A.2d 347, 546 (Pa. 1951). In that Expotech points to no provision in the CSA barring consequential damages, they are available to Cardone as provided in the framework set forth in *Taylor* and will not be dismissed.

## C. Count VI: Declaratory Judgment

Cardone's request for a declaratory judgment is based on a similar premise to its second breach of contract claim. Because of the Arizona lawsuit in which Expotech alleged that

Cardone was infringing on its software copyrights and in light of Expotech's copyright application, Cardone argues that there is an ongoing controversy between itself and Expotech over who holds the software copyright. Alleging that it is the only lawful holder of the ERP software copyright, Cardone requests a declaratory judgment that it:

> is the lawful owner of the computer software developed by Expotech in connection with the CSA and that continued use, development, and/or alteration of the software does not infringe on any purported ownership rights of Expotech; (2) Expotech does not have any intellectual property ownership rights in the software developed by Expotech in connection with the CSA; and (3) the copyright application filed by Expotech and its agents in request number 1-7002455511 and any registration or acceptance of copyrights associated with same are cancelled, and are therefore null, void, and unenforceable as a matter of law.

Expotech argues that, because it has not presently raised any copyright claims in this case and is not "currently using the software applications nor . . . asserting a claim to it," there is no controversy that would give rise to the need for a declaratory judgment.

Framed differently, the question is whether there is a live "case or controversy," *Travelers, Ins. Co. v. Obusek*, 72 F.3d 1148, 1153 (3d Cir. 1995), with respect to the ownership of the copyright to the software developed under the CSA. Article III, Section 2 of the Constitution limits federal jurisdiction to "actual 'cases' and 'controversies[,]'" *id.* (internal citation and quotation omitted), with Article III, Section 2 "stand[ing] as a direct prohibition on the issuance of advisory opinions." *Armstrong World Indus., Inc. v. Adams*, 961 F.2d 405, 410 (3d Cir. 1992). The existence of a "case or controversy" is a "condition precedent to the proper exercise of judicial power by a federal court and the Declaratory Judgment Act can not relax that constitutional requirement." *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950).

Generally, a party shows the existence of a controversy by alleging it suffered an injury – but declaratory judgments, which determine the parties' rights *ex ante* and allow "relief to be

given by way of recognizing the plaintiff's right even though no immediate enforcement of it was asked," *Skelly Oil*, 399 U.S. at 671, are inherently issued before the injury can be "accomplished." *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 647 (3d Cir. 1990). Only if the parties are adverse, the judgment would be conclusive, and the declaration would have utility is issuance of a declaratory judgment proper. *Id.* at 647. "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941).

Cardone argues that the parties are adverse as to the issue of who holds the software copyright because Expotech previously filed a lawsuit and copyright application which put its ownership into dispute. Thus, there is an ongoing controversy as to which party holds copyright to the software. Expotech counters that because a year has elapsed since the Arizona case was dismissed and it has done nothing further with respect to any copyright claims on the software, there is no controversy. But the Arizona lawsuit was dismissed on jurisdictional grounds without prejudice and, for that reason, did not reach the substantive question of copyright ownership. *Expotech Eng'g*, 2019 WL 1043269. Neither party has indicated that the statute of limitations has run on the claim or that the parties reached any agreement regarding copyright; it thus remains to be seen whether Expotech will refile elsewhere. Reading the Counterclaim in the light most favorable to Cardone, the Arizona lawsuit indicates an ongoing controversy over who holds the copyright for the software; this conclusion is supported by the copyright application which the Counterclaim allegations suggest remains pending. While it remains to be seen whether Expotech will seek to pursue its prior claims to the software's copyright, Cardone need

not prove an injury is a "mathematical certainty to occur." *Travelers*, 72 F.3d at 1154. It has sufficiently alleged that there is an ongoing dispute, evidenced by a prior lawsuit and an existing copyright application, between the two parties over who holds the copyright to the software Cardone is currently relying upon to run its company.[7] Its declaratory judgment claim thus survives.

### D. Counts III and IV: Breach of Implied Warranties

Count III of the Counterclaim is premised on the theory that there was an implied warranty in the CSA that Expotech would perform its work in a workmanlike manner – but that it did not. Expotech argues that, because Section Eight of the CSA includes a provision that Expotech agrees to perform all services "in a professional, workmanlike manner," there is an express warranty of workmanlike performance in the contract, which precludes Cardone from bringing a claim for breach of implied warranty. However, the cases it cites do not support its argument. They do not concern the issue of whether a claim which is premised on the breach of an implied warranty is viable if a contract between the parties contains an express warranty. Rather, they address whether a claim premised on an implied-in-fact contract is tenable where an express contract governs the same matter. *See, e.g.*, *Baer v. Chase*, 392 F.3d 609, 617 (3d Cir. 2004); *In re Penn Cent. Transp. Co.*, 831 F.2d 1221, 1229-30 (3d Cir. 1987). Absent citations to case law that supports its argument, Expotech's motion to dismiss Count III must be denied. *See Denny v. Schultz*, 708 F.3d 140 (3d Cir. 2013) (denying claim and noting that plaintiff failed to cite any case law supporting his argument).

Cardone's second implied warranty claim (Count IV) alleges that Expotech breached the implied warranty of fitness for a particular purpose and merchantability. Specifically, Cardone

---

[7] Expotech argues only that the parties are not adverse and does not address the other requirements necessary to obtain a declaratory judgment.

alleges that, prior to entering into the CSA, Expotech was aware that Cardone sought a system implementer to transform its ERP system to build business process standardization throughout the company, and that in entering into the CSA agreement with Expotech, Cardone was relying on Expotech's expertise to complete such work. Expotech first argues that, because the CSA contains an integration clause, there can be no implied warranties. The integration clause reads, "[t]his Agreement constitutes the entire agreement between the Parties as to the Services and other matters it covers, and supersedes all prior agreements, understandings, and representations with respect to such Services. In addition, any policy . . . in whatever form, imposed at any time that purports to obligate [Expotech] shall be void and of no further effect, and you shall not seek to enforce any such obligation." CSA § 15(a). But "warranties may be limited or disclaimed only by clear and unambiguous language." *Tyus v. Resta*, 476 A.2d 427, 432 (Pa. Super. 1984). Because this clause "fails to explain with particularity its purported effect on implied warranties," it does not prevent Cardone from alleging a breach of an implied warranty. *Id.*

Expotech also argues that the warranty of fitness for a particular purpose does not apply to a services contract. But "Pennsylvania federal and state courts have recognized that service contracts – not just contracts for the sale of goods – may include implied warranties of fitness for an intended purpose or of merchantability." *Delaware, Lackawaxen & Stourbridge R.R. Co. v. Star Trak, Inc*., 2018 WL 5296292, at *4 (M.D. Pa. Oct. 25, 2018) (citing *Hoffman v. Misericordia Hosp. of Philadelphia*, 267 A.2d 867, 870-71 (Pa. 1970)).

Finally, Expotech argues that Cardone has not plead sufficient facts to support a breach of this warranty, a claim for which "requires that the seller had reason to know of the buyer's particular purpose at the time of contracting and that the buyer was relying on the seller's expertise." *Altronics of Bethlehem, Inc. v. Repco, Inc.,* 957 F.2d 1102, 1105 (3d Cir. 1992).

Expotech contends that it had no reason to know that Cardone was relying on it for a special purpose at the time the parties executed the CSA. But the allegations in the Counterclaim are to the contrary:

> 59. Prior to entering into an agreement with Cardone, Counterclaim Defendants were aware that Cardone sought a system implementer for the purposes of Cardone's initiative to transform its ERP system to build business process standardization throughout the Cardone enterprise. . . .

> 126. At the time of entering into the CSA, Expotech knew or had reason to know of the particular purpose for which the systems would be used and knew that Expotech's skill and judgment were being relied upon to furnish a suitable finished product.

> 127. Specifically, prior to entering into the CSA, Expotech was aware that Cardone sought a system implementer, such as Expotech, for the purposes of Cardone's initiative to transform its ERP system to build business process standardization throughout the Cardone enterprise. Expotech was further aware that Cardone was relying upon Expotech's expertise to complete such work.

Such goals are also referenced in the "Background" section of the CSA. Cardone has, accordingly, adequately plead a claim for breach of the warranty of fitness for a particular use and merchantability, requiring denial of Expotech's motion on this claim.

### D. Count V: Unjust Enrichment

Cardone brings a claim for unjust enrichment against Expotech, Ghani, and Hosel. To be viable, a claim for unjust enrichment must allege: (1) benefits were conferred on one party by another; (2) the recipient appreciated such benefits; and (3) the benefits were wrongfully secured such that it would be inequitable or unjust for them to be retained without payment of value. *Allegheny Gen. Hosp. v. Philip Morris, Inc*., 228 F.3d 429, 447 (3d Cir. 2000). A party cannot recover for unjust enrichment when an express contract governs the relationship between the parties. *Hershey Foods Corp. v. Ralph Chapek, Inc*. 828 F.2d 989, 999 (3d Cir. 1987); *Villoresi v. Femminella*, 856 A.2d 78, 84 (Pa. Super. 2004). Thus, the Counterclaim Defendants argue that Cardone's claim for unjust enrichment must be dismissed because Cardone has pled that

there is an enforceable contract – the CSA.

### 1. *Against Expotech*

Cardone alleges that, to the extent that Expotech is merely an alter ego of Ghani, Expotech was unjustly enriched by Cardone. But even if Expotech is found to be Ghani's alter ego, that simply means Ghani can be held personally liable for his company's wrongdoing. *Pearson*, 247 F.3d at 484. It does not void the contract signed between Expotech and Cardone. Nor does Cardone in any other way challenge the existence and validity of the CSA. Unjust enrichment is a quasi-contractual doctrine; if a valid contract exists, as it does here, then there is no claim for unjust enrichment. *Skold v. Galderma Labs., L.P.*, 99 F. Supp.3d 585, 599 (E.D. Pa. 2015); *Schott v. Westinghouse Elec. Corp.*, 259 A.2d 443, 448 (Pa. Sup. 1969). Expotech's motion to dismiss Cardone's unjust enrichment claim shall accordingly be granted.

### 2. *Against Ghani*

Cardone also brings a claim for unjust enrichment against Ghani in his individual capacity. Expotech again argues that the contract between Expotech and Cardone precludes such an argument. Cardone, however, is permitted to pursue a claim against Ghani individually as an "alternative" allegation that Ghani is liable as Expotech's alter ego. *See Indep. Enterprises Inc. v. Pittsburgh Water & Sewer Auth.*, 103 F.3d 1165, 1175 (3d Cir. 1997). Setting aside alter ego liability, Cardone could potentially have an unjust enrichment suit against Ghani, as no express contract exists between these parties. *Skold*, 99 F. Supp.3d at 599.

But Cardone fails to identify how precisely Ghani wrongfully secured a benefit from it. Cardone alleges that Ghani received monetary payments from Expotech's account into his personal accounts (and used the Expotech account for other personal and business ventures). But the allegation is simply that money was transferred from Expotech's general account to

Ghani.  To have a claim for unjust enrichment, Cardone must show that it conferred a benefit on

Ghani, meaning Cardone must show that Ghani received money from it.  There are no

allegations that the money transferred to Ghani came all, or in part, from Cardone's project, as

opposed to other projects Expotech may have undertaken.  And as president and sole shareholder

of Expotech, Ghani is entitled to receive payments from his company.  Without allegations that

could plausibly give rise to the inference that the money transferred from Expotech to Ghani is

attributable to Cardone, Cardone fails to sufficiently plead an unjust enrichment claim.

### 3.  *Against Hosel*

Finally, Cardone alleges that Hosel was unjustly enriched by it as a result of the

commercial bribery scheme between Expotech and Hosel.  According to Cardone, the bribery

scheme involved Hosel, Ghani's longtime business associate, aggressively advocating for

Expotech to win the CSA despite knowing that Expotech was unqualified to perform the duties

dictated by the contract, and then maintaining control over the project to prevent other Cardone

employees from realizing Expotech's deficient performance sooner.  In return, Expotech

deposited bribe money directly into Hosel's bank account, with the first payment occurring on

the same day as the first payment from Cardone to Expotech and payments continuing for the

next two years.  Although Hosel denies the existence of the bribery scheme, arguing instead that

the payments were for unrelated projects, such denials are not considered in the context of a

motion to dismiss.  When all inferences are taken in its favor, Cardone plausibly describes a

bribery scheme.

Hosel further argues that Cardone cannot have an unjust enrichment claim against him

because the payments at issue came from Expotech, not Cardone, and Cardone thus conferred no

benefit to him.  But Cardone need not have "directly confer[red]" a benefit on Hosel for the

transaction at issue in order to have a claim. *See Baker v. Family Credit Counseling Corp.*, 440 F. Supp.2d 392, 420 (E.D. Pa. 2006). All Cardone must show is that it conferred a benefit on Hosel by some means. Cardone alleges that when it accepted the contract with Expotech, this directly resulted in Hosel receiving payments upwards of $815,000, a monetary benefit. Hosel does not deny that he accepted the money, so he actually received the benefit. *Allegheny Gen. Hosp.*, 228 F.3d at 447. Taking all inferences in Cardone's favor, if such a bribery scheme existed, and Hosel encouraged Cardone to sign the CSA with Expotech simply because he was bribed, then allowing him to retain that benefit would be unjust, and Expotech's motion must be denied. *Id.*

### E. Count VII: Conversion

Cardone's next claim is for conversion against Expotech, Ghani, and Hosel. Conversion is "the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification." *Brown & Brown, Inc. v. Cola*, 745 F. Supp.2d 588, 622 (E.D. Pa. 2010). Money can be the subject of conversion. *McKeeman v. Corestates Bank, N.*A., 751 A.2d 655, 659 n.3 (Pa. Super. 2000). While deliberately taking another's property without consent is the clearest example of conversion, taking one's property with consent for a specific purpose, but with the intent to use it for another in conflict with that person's interest, is also conversion. *Cenna v. United States*, 402 F.2d 168, 170 (3d Cir. 1968).

#### 1. *Against Expotech*

Cardone alleges that, instead of using the money provided under the CSA to fund and complete the project, Expotech converted the funds for Ghani's personal and business interests. Cardone seeks the return of the contract price, as well as additional extracontractual expenses. Expotech argues that, because a contract exists between itself and Cardone, the gist of the action

doctrine bars recovery. The gist of the action doctrine prevents a plaintiff from recovering tort damages for a contract claim. *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 68 (Pa. 2014). Specifically, a plaintiff cannot recovery under the doctrine: "(1) where the claim arises solely from a contract between the parties; (2) where the duties allegedly breached were created by a contract; (3) where liability is derived from a contract; or (4) where the success of the tort claim is dependent on the terms of a contract." *Kia v. Imaging Scis. Int'l, Inc.*, 735 F. Supp.2d 256, 271 (E.D. Pa. 2010). The key difference between contract and tort is that duties under the latter are imposed as a matter of social policy, while the former stems from duties imposed by mutual consensus. *Pittsburgh Constr. Co. v. Griffith*, 834 A.2d 572, 582 (Pa. Super. 2003). Thus, even where the property is also subject to a contract, it is not automatically precluded under the gist of the action doctrine if the defendant's duty not to take that property stemmed from social norms, not contract. *Brown*, 745 F. Supp.2d at 623.

To the extent Cardone's conversion claim against Expotech seeks to recover the contract price, it is precluded by the gist of the action doctrine. The amount Cardone paid for Expotech's performance was negotiated in the CSA, and any recovery of that amount arises solely from the CSA. Whether Expotech misappropriated the money is also tied up in questions of whether Expotech actually performed its contractual duties. Cardone reached an agreement with Expotech as to what the parties viewed the value of Expotech's services to be. To show that the full contract price (or even part of the contract price) was misappropriated, Cardone would have to show that, despite taking the money, Expotech failed to fulfill contractual duties and failed to provide services commensurate to monetary value it paid. When the conversion claim is so inextricably entwined with the contract claim, the gist of the action doctrine bars recovery. *See Brown*, 745 F. Supp.2d at 623.

But Cardone requests recovery for more than just the contract price. It alleges that Hosel and Expotech colluded to drive up extracontractual expenses. Specifically, the allegation is that Hosel and Expotech worked together to secure "additional extracontractual funds" through tactics such as manipulating invoices and the salaries of consultants. These additional costs were not anticipated by the CSA, and Cardone's conversion claim as it pertains to these amounts arises from an affront to the social norm to not take the property of another. Thus, to the extent Cardone seeks extracontractual damages, Expotech's motion will be denied.

### 2. *Against Ghani*

Cardone also brings a conversion claim against Ghani in his individual capacity, again arguing the contract payments were used to fund his personal and business ventures instead of work on the CSA. Cardone further alleges that Ghani drained all funds from Expotech before completing work on the CSA.

Although no direct contract is alleged as between Ghani and Cardone, Cardone "cannot detach" Cardone's role as the president of Expotech from this case. *See Williams v. Hilton Grp. PLC,* 93 F. App'x 384, 386 (3d Cir. 2004) (holding that the gist of the action doctrine precluded bringing a lawsuit against the contract's principal negotiator, even though the negotiator was not a direct party to the contract). Once again, to the extent Cardone seeks to recover the simple cost of the contract, it is precluded. And while the Counterclaim alleges communications between the "Expotech defendants" or Expotech and Hosel manipulating invoices and altering salaries, it fails to make any allegations as to Ghani's individual role, if any, in this regard. Cardone further has not sufficiently alleged that it had any specified property interest in money transferred from Expotech's general business account. *See Brown*, 745 F. Supp.2d at 623 (requiring a property interest in the converted item). Cardone simply alleges that money was transferred out of

Expotech's bank account. Even taking all inferences in Cardone's favor, it pleads no facts that give rise to a plausible inference that the money Ghani received was its money. Without pleading a property interest, Cardone does not have a claim for conversion against Ghani.

### 3. Hosel

Cardone finally alleges that Hosel converted over $815,000 of its funds as a result of the commercial bribery scheme. Thus, Cardone alleges that a portion of the money it provided to Expotech for work done pursuant to the CSA instead went to Hosel to compensate him for helping Expotech get the contract. Cardone also pleads a direct connection between the money and the conversion: the first payment to Hosel occurring the same day as Cardone's first payment. Taking all inferences in Cardone's favor, these payments, as well as Hosel's alleged personal involvement with manipulating invoices and altering salaries to raise expenses for Cardone, could plausibly represent conversion of funds which should have been used to complete work under the CSA but which was instead used to line the pockets of one of Cardone's own employees, meaning the claim is sufficiently plead.

## F. Count X: Civil Conspiracy

Cardone's civil conspiracy count is premised on the same alleged commercial bribery scheme.

To state a claim for civil conspiracy, Cardone must allege: (1) a combination of two or more persons acting with a common purpose to do an unlawful act; (2) an overt act done in pursuance of the common purpose; and (3) actual damages. *Goldstein v. Phillip Morris, Inc*., 854 A.2d 585, 590 (Pa. Super. 2004). *See also McGreevy v. Stroup*, 413 F.3d 359, 371 (3d Cir. 2005) (explaining that a "claim for civil conspiracy requires that two or more people conspire to do an unlawful act").

Cardone alleges that Hosel, Ghani, and other Expotech employees acted together to convert money from Cardone. As set forth, *supra* Part III.F, Cardone's Counterclaim states a plausible claim for an unlawful act – conversion – against Expotech and Hosel. It also alleges that, by means of the bribery scheme and the altering of invoices and salaries, multiple overt acts in furtherance of the conversion occurred. And finally, Cardone alleges that it suffered monetary loss as a result of the scheme. Cardone thus adequately alleges a civil conspiracy. As with the underlying conversion claims, however, to the extent that Cardone seeks to recover amounts associated with the CSA, such recovery is precluded by the gist of the action doctrine. *Supra id.*

### G. Counts VIII and IX: Civil RICO

Cardone alleges that Expotech, Ghani, and Hosel conspired to create and entered into a bribery enterprise designed to steal funds from Cardone in violation of RICO. RICO, which has both a criminal and civil component, was designed primarily to provide aggressive new remedies to combat organized crime. *See Sedima S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 498 (1985). But its scope expands far beyond conventional organized crime, and Congress admonished that it is to "be liberally construed to effectuate its remedial purposes." *Id.* Civil RICO can be violated in four different ways, and each subsection has its own separate requirements. *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1411 (3d Cir. 1991). Cardone alleges Defendants violated two subsections of RICO: 1962(c)[8] and 1962(d).

Hosel moved for a more definite statement under Federal Rule of Civil Procedure 12(e), specifically requesting a "RICO case statement." Rule 12(e) is "directed to the rare case where because of the vagueness or ambiguity of the pleading the answering party will not be able to frame a responsive pleading." *Schaedler v. Reading Eagle Publ'n, Inc.*, 370 F.2d 795, 798 (3d

---

[8] Cardone's Counterclaim does not specify the subsection for Count VIII, but in its brief in opposition to Expotech's motion to dismiss, it clarifies that the claim is under subsection c.

Cir. 1967). RICO case statements are an authorized and common use of the rule. *Northland Ins.*

*Co. v. Shell Oil Co.*, 930 F. Supp. 1069, 1074 (D.N.J. 1996). They are a "useful, sometimes

indispensable, means to understand the nature of the claims asserted and how the allegations

satisfy the RICO statute." *Old Time Enterprises, Inc. v. Int'l Coffee Corp.*, 862 F.2d 1213, 1216

(5th Cir. 1989). *See also Nat'l Org. of Women, Inc. v. Scheidler*, 510 U.S. 249, 253 (1994);

*Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, Inc., 46 F.3d 258, 264 (3d Cir. 1995); *Lightning*

*Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1188 (3d Cir.1993); *Laurel Gardens, LLC v. McKenna*,

2019 WL 7020124, at *1 (E.D. Pa. Dec. 20, 2019); *Tierney & Partners, Inc. v. Rockman*, 274 F.

Supp.2d 693, 701 (E.D. Pa. 2003); *Gintowt v. TL Ventures*, 226 F. Supp.2d 672, 681 (E.D. Pa.

2002).

Both Expotech, in its motion to dismiss, and Hosel, in his motions to dismiss and for a

more definite statement, raise numerous concerns about the shortcomings of Cardone's RICO

claim. For example, Cardone failed to identify the specific subsection of RICO under which it

brought one of its claims, which created confusion for Defendants in drafting their motions. The

Counterclaim lacks clarity on issues such as how Cardone satisfies RICO standing requirements,

*Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000); the precise nature, duration, and

membership of the RICO association, *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 364 (3d

Cir. 2010); and what statutory violations and predicate acts are alleged to represent the pattern,

*Shearin v. E.F. Mutton Grp., Inc.*, 885 F.2d 1162, 1166 (3d Cir. 1989). After considering

Cardone's Counterclaim allegations and Defendants' arguments, a RICO case statement is

warranted to allow Defendants to properly and fully respond to Cardone's RICO claims.

### H. Hosel's Severance and Confidentiality Agreements

Cardone's suit against Hosel is intertwined with the underlying events described above

but also contains allegations about two agreements Hosel signed while he was the Vice President of Finance for Cardone.  The first, signed in May 2017, was a confidentiality agreement in which he agreed not to disclose to any person or entity, without Cardone's prior written consent, any of Cardone's confidential information unless such a disclosure was in the furtherance of Cardone's business.  The second agreement, the severance agreement, was signed in June 2018, when Hosel "was separated from his employment with Cardone."  As part of the severance agreement, Hosel affirmed that he did not breach the May 2017 confidentiality agreement and that he did not receive any form of benefit from Expotech or Ghani.

Cardone's Complaint against Hosel contains four counts.  Count I alleges that Hosel breached the May 2017 confidentiality agreement by disclosing private information to Expotech in order to help Expotech win the CSA.  Count II alleges that Hosel breached the severance agreement because he falsely affirmed in it that he did not breach the confidentiality agreement and that he did not receive any benefits from Expotech or Ghani.  Count III alleges that, by making the false affirmances in the severance agreement, Hosel fraudulently induced Cardone to sign the agreement.  And finally, Count IV alleges that, by breaching the confidentiality agreement and committing other wrongful acts, Hosel breached his fiduciary duties to Cardone. Hosel moves to dismiss Counts III and IV.  In its Counterclaim, Cardone alleges that Ghani and Expotech aided and abetted Hosel in breaching his fiduciary duties.  The Counterclaim Defendants have moved to dismiss this count as well.

### a.  Hosel Count III: Fraud in the Inducement

With respect to the fraud in the inducement claim against Hosel, Cardone points to language in the severance agreement where Hosel affirmed that he never received "any remuneration or benefits, directly or indirectly, from ExpoTech, Inc., its affiliates, and/or their

officers, employees, or representatives, including, but not limited to, Rod Ghani," and that Cardone "is relying on the foregoing representations as a material inducement to agree to the release of claims against Employee and that if such representations are not accurate or are breached, in whole or in part, by Employee, then the release of claims provided by Cardone to Employee as set forth in Section 3(a) above is null and void." Cardone alleges that Hosel knew he did not comply with those affirmances when he signed the agreement.

Hosel argues that the gist of the action doctrine precludes this claim. According to Hosel, Cardone is simply trying to recast a breach of contract as a tort by saying Hosel never intended to abide by a term of the contract. Pennsylvania state and federal courts have reached different conclusions about whether the gist of the action doctrine applies to fraudulent inducement claims. *Compare Sullivan v. Chartwell Inv. Partners, LP*, 873 A.2d 710, 719 (Pa. Super. 2005) (allowing claim for fraud in the inducement to proceed where defendant fraudulently promised to perform actions it never intended to perform in order to induce a change in the contract), with *Vives v. Rodriguez*, 849 F. Supp.2d 507, 518-20 (E.D. Pa. 2012) (collecting cases and holding fraudulent inducement claim barred by gist of the action doctrine).

The gist of the action doctrine can be boiled down to one key question, "[w]hat's this case really about?" *Downs v. Andrews*, 639 F. App'x 816, 819 (3d Cir. 2016). Here, Cardone is alleging that Hosel misrepresented his intent to abide by a term of the contract – an affirmance that he received no benefit from Expotech or Ghani and that he did not breach the confidentiality agreement – and that misrepresentation induced Cardone to sign the severance agreement. Absent such a term in the contract, Hosel would not be obligated to affirm either of those propositions. The core of the dispute is thus about the contract: the case is about "a specific promise to do something that a party would not ordinarily have been obligated to do but for the

existence of the contract." *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 68 (Pa. 2014). Under the gist of the action doctrine, such a claim should be barred. *See Vives*, 849 F. Supp.2d at 518-21; *Wen v. Willis*, 117 F. Supp.3d 673, 682 (E.D. Pa. 2015).

Cardone attempts to distinguish its claim by arguing that this case is not about intent to perform the contract, but about Hosel's representations that he never breached his confidentiality agreement and never received benefits from Expotech. While such a distinction may potentially explain the differing outcomes of courts that have approached this issue, *see Sullivan*, 873 A.3d at 719 (noting that "Appellant's allegations do not relate to Appellee's failure to perform its obligations under the contracts"), Cardone's claim is about Hosel's failure to perform. The severance agreement explicitly included the term that Hosel did not breach the May confidentiality agreement and did not receive any benefit from Expotech or Ghani. Cardone's allegation about Hosel's knowledge at the time of signing is functionally the same as a party signing a contract knowing they have no intention of performing their duties under it. *See Downs*, 639 F. App'x at 820 (barring fraud in the inducement claim where defendant fraudulently represented that it owned notes subject to the contract that it never owned or controlled); *Atlantic Holdings, Ltd. v. Apollo Metals, Ltd.*, 263 F. Supp.3d. 526, 531 (E.D. Pa. 2017) (barring fraud in the inducement claim where defendant misrepresented its intent to engage in settlement talks as required by the contract). The remedies for a contract breach are found in the terms of the contract itself, and any potential breach of the terms can be remedied through Cardone's breach of contract claim. Expotech's motion thus shall be granted on this claim.

### b. Hosel Count IV and Counterclaim Count XI: Fiduciary Duty

Cardone alleges Hosel breached his fiduciary duty to Cardone and that Ghani and

Expotech aided and abetted him in that breach.[9]  In addition to pointing to the May 2017

confidentiality agreement, Cardone alleges that, as the former Vice President of Finance, Hosel

had "total oversight and management powers over critical, company-wide initiatives," including

the SAP ERP project.  Further, as an employee, Hosel agreed to abide by the company's Code of

Ethical Conduct, pursuant to which he agreed not to allow himself "to be placed into a position

where there is even the impression of impropriety," to always act in Cardone's best interest, and

to not accept contributions for individual benefit.  Cardone also alleges that Hosel was bound by

the Conflicts of Interest policy, which included the obligation to avoid "[a]ny activity which

even *appears* to present . . . a conflict" without disclosure to the appropriate management. . . . "

### 1. Against Hosel

A breach of fiduciary duty occurs when: (1) an employee negligently or intentionally

fails to act in good faith and solely for the benefit of the employer in all matters for which he or

she was employed; (2) the employer was injured; and (3) the employee's failure to act solely for

the employer's benefit was a real factor in bringing about the employer's injuries.  *Colgate-*

*Palmolive Co. v. Tandem Indus.*, 485 F. App'x 516, 518 (3d Cir. 2012).

Hosel again argues that this claim is precluded under the gist of the action doctrine.

Whether the doctrine bars a breach of fiduciary duty claim generally turns on the specific type of

breach alleged.  *Compare Bohler-Uddenholm Am., Inc. v. Ellwood Grp., Inc*., 247 F.3d 79, 105

(3d Cir. 2001) (allowing claim to go forward because a majority shareholder's duties to deal

fairly with a minority shareholder in a joint venture are imposed "as a matter of social policy"),

*with Brown*, 745 F. Supp.2d at 621 (barring claim when alleged duties were "nothing more than

a restatement of Plaintiffs' breach of contract claim").  For example, in *USG Insurance Services*,

---

[9] For the purposes of Hosel's motion to dismiss the breach of fiduciary claim, the allegations considered are those raised in Cardone's Complaint against him.  For Expotech's motion to dismiss the aiding and abetting claim, the allegations considered are those found in Cardone's Counterclaim.

while most of the allegations of breach of fiduciary duty were dismissed because they were on all fours with the breach of contract claim, the court noted that at least one allegation was distinct from the contract: the defendant failed "to perform his job responsibilities in an adequate manner before resigning."  2016 WL 6901332, at *8 (W.D. Pa. Nov. 22, 2016).

To the extent Cardone's breach of fiduciary claim against Hosel is premised on the agreements entered into between them, it is barred by the gist of the action doctrine.  *See DePuy Synthes Sales, Inc. v. Globus Med., Inc*., 259 F. Supp.3d 225, 236 (E.D. Pa. 2017) (barring fiduciary duty claim because the "alleged violations mirror, in almost identical fashion, the obligations of the employment agreements which form the basis of the breach of contract claim").

But Cardone also alleges, for example, that Hosel's "failure to act solely for Cardone's benefit" – such as by advocating for an unqualified company to be awarded the CSA – caused it harm and that his participation in the bribery scheme was a breach of his fiduciary duties.  Like the defendant in *USG Insurance Services*'s duty to perform his job in an adequate manner, 2016 WL 6901332, at *8, these duties arise from the social policy that a fiduciary "act in good faith and solely for the benefit of the employer in all matters for which he or she was employed." *Colgate*, 485 F. App'x at 518.  Cardone's breach of fiduciary duty claim against Hosel survives only to the extent that it arises from the bribery scheme and not the confidentiality and severance agreements.

### 2. Against Expotech and Ghani

Cardone's Counterclaim that Expotech aided and abetted Hosel in breaching his fiduciary duty to Cardone by bribing him to award Expotech a contract it was not qualified to perform remains viable.

Aiding and abetting breach of fiduciary duty has three elements: (1) a breach of a fiduciary duty owed to another; (2) knowledge of the breach by the aider and abettor; and (3) substantial assistance or encouragement by the aider and abettor in effecting that breach. *Chicago Title Ins. Co. v. Lexington & Concord Search & Abstract, LLC*, 513 F. Supp.2d 304, 318 (E.D. Pa. 2007).

As explained above, Cardone sufficiently alleged that Hosel breached his fiduciary duty to the company. Expotech, however, argues that the "more plausible" reading of the Counterclaim is not that Expotech bribed Hosel, but that Ghani was paying Hosel for an unrelated project. At the motion to dismiss stage, all inferences must be taken in Cardone's favor, and Cardone sufficiently alleges that the transactions represent bribes. *Warren Gen. Hosp. v. Amgen, Inc*., 643 F.3d 77, 84 (3d Cir. 2011). Second, Cardone alleges that Expotech and Ghani knew that the company was unqualified to perform the CSA (and thus awarding Expotech the contract was not in Cardone's best interest), but nonetheless bribed Hosel to ensure Expotech won the contract. Thus, Cardone alleges knowledge of a breach on behalf of Ghani and Expotech. Finally, Cardone alleges that Expotech paid Hosel over $815,000 to encourage him to breach his fiduciary duties, thus meeting all requirements to adequately plead aiding and abetting breach of a fiduciary duty.

## III.    CONCLUSION

For the foregoing reason, Expotech's motion to dismiss the Counterclaim shall be granted in part and denied in part. Hosel's motion to dismiss the Counterclaim shall be denied. Hosel's motion for a more definite statement of the RICO claims shall be granted. Hosel's motion to dismiss two of the claims in Cardone's Complaint against him shall be granted in part and denied in part. An appropriate order follows.

**April 7, 2020**                    **BY THE COURT:**

                                     **/s/Wendy Beetlestone, J.**

                                     **WENDY BEETLESTONE**