IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EXPOTECH ENGINEERING, INC.,<br>        Plaintiff, | CIVIL ACTION |
| v. | |
| CARDONE INDUSTRIES, INC.,<br>        Defendant/Counterclaim Plaintiff, | NO.  19-1673 |
| v. | |
| EXPOTECH ENGINEERING, INC.,<br>ROD GHANI, MARSHALL HOSEL<br>        Counterclaim-Defendants. | |

## MEMORANDUM OPINION

Before the Court for a second time on a Motion to Dismiss is a dispute between Cardone Industries and Expotech Engineering.  Because the lengthy factual and procedural background has already been recounted, *see Expotech Eng'g, Inc. v. Cardone Indus., Inc.*, 2020 WL 1694543 (E.D. Pa. Apr. 7, 2020), only what is necessary for resolution of the present motions and new allegations raised in the Third Amended Counterclaim shall be addressed.

This suit emerges from an agreement that Cardone Industries, Inc. entered into with SAP America, Inc. whereby SAP was to provide Cardone with Enterprise Resource Planning ("ERP") software, systems, and technology.  Cardone sought vendors to assist it with its implementation and chose Plaintiff, Expotech.  In February 2016, Cardone and Expotech entered into a Consulting Services Agreement ("CSA") whereby Expotech was to provide the agreed upon services and Cardone was to pay for those services.  But Cardone stopped paying, and Expotech sued for a single count of breach of contract.

Cardone, in return, filed a multi-count[1] counterclaim against Expotech and its principal

---

[1] Specifically, Cardone alleges two counts of breach of contract; breach of warranty of workmanlike performance

1

and sole shareholder, Rod Ghani ("the Expotech Defendants"), as well as Cardone's former Vice President of Finance, Marshall Hosel (collectively, "the Defendants").  The allegations describe a commercial bribery scheme through which Ghani paid off Hosel to the tune of approximately $1.2 million in order to win the CSA; portray Expotech as a sham corporation designed for Ghani's monetary benefit; and contend that Expotech misrepresented its ability to handle the SAP ERP implementation project, failed to perform the work that it had agreed it would do, and stopped work on the project before the work was completed.  Cardone also alleges that the Defendants worked together in other ways to covertly benefit themselves.  For example, in the Third Amended Counterclaim, Cardone includes details of a "kickback scheme," whereby the Expotech Defendants induced Hosel to convince Cardone to enter into an agreement with Spright, an IT staffing company.  Under that agreement, Cardone would pay to Spright 20 percent of the base salary of each person Cardone hired through Spright.  Unbeknownst to Cardone, the Expotech Defendants negotiated a separate agreement with Spright under which they would receive half of Spright's commissions paid by Cardone pursuant to the Spright-Cardone contract.  Hosel then, in turn, received 33 percent of the money Expotech received from Spright.  Collectively, Expotech alleges that through this scheme, the Defendants obtained at least $78,000 in Cardone funds.

   Cardone also filed a separate lawsuit against Hosel (now consolidated with this case and arising from the same set of facts) setting forth two counts of breach of contract, one count of fraud in the inducement, and one count of breach of fiduciary duty.

   Expotech, Ghani, and Hosel filed motions to dismiss the Second Amended Counterclaim

---

and merchantability; breach of fiduciary duty; unjust enrichment, conversion, violations of the Racketeer Influenced and Corrupt Organizations Act, and civil conspiracy, and it requests a declaratory judgment.

pursuant to Federal Rule of Civil Procedure Rule 12(b)(6).  Hosel also filed a motion under Rule 12(e) for a more definite statement of the Racketeer Influenced and Corrupt Organizations Act ("RICO") claim.  The motions were granted in part and denied in part.  As relevant here, Cardone's claim for unjust enrichment as it pertained to Expotech and Ghani was dismissed without prejudice.  *Expotech*, 2020 WL 1694543, at *9-10.  Cardone's conversion claim against Expotech was dismissed to the extent it sought contract damages and dismissed as to Ghani individually.  *Id.* at *10-11.  Finally, Hosel's motion for a more definite RICO statement was granted, and Cardone was ordered to file a RICO case statement.  *Id.* at *12-13.

Cardone was granted leave to file a Third Amended Counterclaim, along with a RICO case statement which it did.  Expotech, on behalf of itself and Ghani, moves to dismiss the newly pled unjust enrichment, conversion, and RICO claims under Federal Rule of Civil Procedure 12(b)(6).  Hosel moves to dismiss the RICO claims under Rule 12(b)(6).

## I.     LEGAL STANDARD

To survive a motion to dismiss, the Counterclaim must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[2]  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted).  The claims are construed in the light most favorable to the non-moving party.  *Warren Gen. Hosp. v. Amgen, Inc.*, 643 F.3d 77, 84 (3d Cir. 2011).  Factual allegations must be separated from legal conclusions and recitations of the element of the claim, as legal conclusions are not sufficient to state a plausible claim.  *Iqbal*, 556 U.S. at 678.  At the motion to dismiss stage, all well-pleaded allegations in the Counterclaim are

---

[2] At points in its briefing, Expotech appears to suggest that Cardone must plead its case "with particularity," the heightened pleading standard applicable to fraud cases.  As none of Cardone's claims are based on fraud, this heightened standard is inapplicable.  *See, e.g.*, *Odesser v. Cont'l Bank*, 676 F. Supp. 1305, 1313 (E.D. Pa. 1987) ("Plaintiff is correct that allegations of [RICO] conspiracy are not measured under the rule 9(b) standard, which requires greater particularity of allegation of fraud, but are measured under the more liberal rule 8 pleading standard.").

accepted as true and all reasonable inferences are drawn in favor of Cardone, the non-moving party. *See In re Rockefeller Ctr. Properties, Inc. Sec. Lit.*, 311 F.3d 198, 215 (3d Cir. 2002). Accordingly, "a well-pleaded [counterclaim] may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

## II.     DISCUSSION

### A.  Count V: Unjust Enrichment

The Expotech Defendants move to dismiss the claim for unjust enrichment against Ghani.[3] To plausibly plead unjust enrichment, Cardone must allege that: (1) benefits were conferred on one party by another; (2) the recipient appreciated such benefits; and (3) the benefits were wrongfully secured such that it would be inequitable or unjust for them to be retained without payment of value. *Allegheny Gen. Hosp. v. Philip Morris, Inc*., 228 F.3d 429, 447 (3d Cir. 2000). The Court previously held that Cardone can pursue a claim against Ghani individually as an "alternative" to the allegation that Ghani is liable as Expotech's alter ego. *See Expotech*, 2020 WL 1694543, at *9 (citing *Indep. Enterprises Inc. v. Pittsburgh Water & Sewer Auth.*, 103 F.3d 1165, 1175 (3d Cir. 1997)). But the claim nevertheless was dismissed, because Cardone failed "to identify how precisely Ghani wrongfully secured a benefit from it." *Id.* It was specifically noted that Cardone failed to plausibly show Ghani individually actually received money that came "all, or in part, from Cardone's project, as opposed to any other project." *Id.*

In its Third Amended Counterclaim, Cardone remedies that shortcoming. Cardone alleges that Exptoech's gross sales receipts over the life of the CSA were approximately $18

---

[3] Although the Counterclaim still contains allegations of unjust enrichment against Expotech as well, those claims were dismissed in the Court's prior opinion**,** and Cardone does not attempt to revive these claims in its briefing. *See Expotech*, 2020 WL 1694543, at *9. Cardone's claim for unjust enrichment against Expotech remains dismissed.

4

million—a number strikingly similar to the roughly $20 million Cardone paid Expotech over that time period.  Moreover, Cardone alleges close-in-time transactions between payments from Cardone to Expotech and payments from Expotech to Ghani's personal ventures.  For example, Cardone alleges that "at the end of the day on June 21, 2018, Expotech had a balance of $96,631.83 in its . . . account.  On June 22, 2018, Cardone paid Expotech $241,700.  On the same day, Expotech paid $245,007.06 to Midfirst Bank for construction" related to one of Ghani's other ventures.  Through these allegations, Cardone plausibly alleges that (1) it conferred benefits in the form of monetary payments to Expotech, and (2) Ghani himself appreciated those benefits by using the money to pay for private ventures.  *See Allegheny*, 228 F.3d at 447.  Finally, Cardone alleges both that the money at issue should have, but was not, used primarily to execute the contract and that Ghani only received the CSA in the first instance through bribing Hosel.  Thus, it would be inequitable to allow Ghani to retain Cardone's money.  *Id.*  At the motion to dismiss stage, Cardone's burden is simply to plead factual allegations that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  Cardone's extensive, specific allegations meet that burden.

Finally, to the extent Expotech argues that Cardone only pleads contractual damages, the Court already held that while the purely contractual damages Cardone sought would be dismissed, it adequately alleged extra-contractual damages, including that "Hosel and Expotech worked together to secure 'additional extracontractual funds' through tactics such as manipulating invoices and the salaries of consultants."  *Expotech*, 2020 WL 1694543, at *11.  And in the Third Amended Counterclaim, Cardone alleges additional extracontractual funds in the form of the kickback scheme, which was not anticipated by the CSA.  Under law-of-the-case doctrine, this matter is settled, *see In re Pharmacy Benefit Managers Antitrust Litig.*, 582 F.3d

432, 439 (3d Cir. 2009) (internal citation omitted) (noting that the doctrine exists to "maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit"), and no information in the Counterclaim changes the previous determination.

### B. Count VII: Conversion

The Expotech Defendants next move for dismissal of the conversion claims against Ghani and Expotech. Conversion is "the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification." *Brown & Brown, Inc. v. Cola*, 745 F. Supp.2d 588, 622 (E.D. Pa. 2010) (internal citation omitted). In its previous opinion, the Court held that, to the extent Cardone seeks extracontractual damages, it has a viable conversion claim against Expotech. *See Expotech*, 2020 WL 1694543, at *10-11. Nothing in the Third Amended Counterclaim or Expotech's briefing changes that conclusion. Thus, once again, under law-of-the-case doctrine, Cardone has a viable claim for conversion against Expotech, with recovery limited to extracontractual damages. *See Pharmacy Benefit*, 582 F.3d at 439.

In its last opinion, however, the Court dismissed without prejudice the conversion claim against Ghani individually. *Expotech*, 2020 WL 1694543, at *11. The Court first noted that Cardone "fail[ed] to make any allegations as to Ghani's individual role, if any," in the manipulation of invoices and salaries. *Id.* Further, the former Counterclaim "simply allege[d] that money was transferred out of Expotech's bank account" without tying it to Ghani. *Id.* As explained, *supra* Section III.A, the Third Amended Counterclaim remedies the latter shortcoming, through for example, allegations of close-in-time transactions between Cardone paying Expotech and Expotech paying for Ghani's personal endeavors. The Third Amended

Counterclaim also includes additional allegations of Ghani's direct involvement with the purported wrongdoing, such as by alleging Ghani was the actor behind directing funds to be converted to his personal use, and by alleging specific conversations between Ghani and Hosel to take steps to pretend work was being completed on the CSA (thus continuing the sham), all the while retaining money for themselves.  Further, the Amended Counterclaim adds allegations about the alleged kickback scheme, in which Ghani is alleged to have separately negotiated for a staffing company to pay half of the referral fee it received from Cardone to himself.

To the extent Cardone seeks contractual damages, it remains barred, because even though there is no direct contract alleged "between Ghani and Cardone, Cardone 'cannot detach' Cardone's role as the president of Expotech from this case." *Expotech*, 2020 WL 1694543, at *11 (quoting *Williams v. Hilton Grp. PLC*, 93 F. App'x 384, 386 (3d Cir. 2004) (holding that the gist of the action doctrine precluded bringing a lawsuit against the contract's principal negotiator, even though the negotiator was not a direct party to the contract)).  Cardone thus cannot recover contractual damages against Ghani either.  But the extracontractual damages described above and others in the Third Amended Counterclaim "were not anticipated by the CSA, and Cardone's conversion claim as it pertains to these amounts arises from an affront to the social norm to not take the property of another." *Expotech*, 2020 WL 1694543, at *11.  Cardone thus has a plausible claim that this allegedly illicitly-acquired extracontractual money was wrongfully converted from Cardone.

### C.  Counts VIII and IX: Civil RICO

Cardone alleges that Expotech, Ghani, and Hosel ran an informal enterprise through which they referred each other work and created a mutually beneficial kickback scheme—and enacted a bribery scheme designed to steal funds from Cardone in violation of RICO.  RICO,

7

which has both a criminal and civil component, was designed primarily to provide aggressive new remedies to combat organized crime. *See Sedima S.P.R.L. v. Imrex Co., Inc*., 473 U.S. 479, 498 (1985). But its scope expands far beyond conventional organized crime, and Congress admonished that it is to "be liberally construed to effectuate its remedial purposes." *Id.* (internal citations omitted). Civil RICO can be violated in four different ways, and each subsection has its own separate requirements. *Kehr Packages, Inc. v. Fidelcor, Inc*., 926 F.2d 1406, 1411 (3d Cir. 1991).

Cardone alleges Defendants violated two subsections of RICO: 1962(c) and 1962(d).[4] Section 1962(c) provides that it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Section 1962(d) makes it illegal to conspire to commit a RICO violation. *Id.* § 1962(d).

1. Standing

Before any RICO claim can proceed, the counterclaimant must establish standing to sue under the statute. To do so, Cardone is required to show that: (1) it suffered an injury to its business or property; and (2) its injury was proximately caused by Defendants' RICO violation. *Maio v. Aetna, Inc*., 221 F.3d 472, 483 (3d Cir. 2000). Although related, these inquiries are analytically distinct. *Id.*

Turning first to injury, this element can be satisfied by allegations of "actual monetary loss." *Id.* at 484; *see also Hausknecht v. John Hancock Life Ins. Co. of N.Y*., 334 F. Supp.3d 665, 682 (E.D. Pa. 2018) ("Financial loss is at the heart of RICO[.]"). Cardone alleges extensive

---

[4] Section 1962 sets out the standards for criminal RICO violations. Pursuant to Section 1964(c), a person injured by a violation of Section 1962 can file a civil suit for recovery.

financial damage, including that it paid nearly $20 million for a contract that was never finished, and that it was forced to pay inflated "extra-contractual expenses." Additionally, Cardone alleges that, because of the contract's incompletion, the company lost sales and "high value clients," which led to further financial loss. These are not speculative damages "predicated exclusively on the *possibility* that future events might occur," *see Maio*, 221 F.3d at 495, but rather allegations of loss that already occurred.[5] Cardone has thus adequately alleged injury.

Proximate cause in the RICO context largely mirrors its common law foundations, requiring "some direct relation between the injury asserted and the injurious conduct alleged." *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 9 (2010). A plaintiff cannot recover if its injuries are "too remote, purely contingent, or indirect." *Id.* (internal quotations and alterations omitted). The most relevant considerations are: (1) the directness of the injury; (2) the risk of multiple recoveries; and (3) the likelihood that others may vindicate claims for the harm alleged. *In re Avandia Mktg., Sales Practice & Product Liab. Litig.*, 804 F.3d 633, 642-44 (3d Cir. 2015). Additional potentially relevant factors include the specific intent of defendant to harm plaintiff; the nature of plaintiff's alleged injury; and whether the damages appear speculative. *Anderson v. Ayling*, 396 F.3d 265, 270 (3d Cir. 2005). Cardone's theory of causation is straightforward: Expotech and Ghani bribed Hosel into tricking Cardone into accepting a contract that Expotech was not qualified to perform, and as a result, Cardone lost money and clients. Had Expotech not committed the predicate bribery, Cardone would not have entered into the contract that led to its losses. Thus, the injury is direct and foreseeable. *Compare with Hemi*, 559 U.S. at 9 (holding

---

[5] Expotech argues that "breach of contract damages cannot be reinvented as damages resulting from an act of racketeering activity," citing *Annulli v. Panikkar*, 200 F.3d 189, 200 (3d Cir. 1999), for this proposition. In doing so, Expotech misrepresents *Annulli*'s holding. *Annulli* regards what types of violations can qualify as a *predicate act*, noting that "RICO's list of acts . . . is exhaustive." *Id.* Thus, "garden-variety state law crimes, torts, and contract breaches" cannot qualify. *Id.* The cited passage in *Annulli* says nothing about RICO standing and damages. Cardone does not allege that the contract violation was a predicate RICO act. Rather, it alleges a bribery scheme.

that a case which would require the Court to "extend RICO liability to situations where the defendant's fraud on the third party (the State) has made it easier for a fourth party (the taxpayer) to cause harm to the plaintiff (the City)" too attenuated).

Nor is there any risk of multiple recoveries or a likelihood of others vindicating a claim for the harm alleged: Cardone is requesting recovery only for the injuries caused directly to its business. There are no readily identifiable other persons or entities who would or could try to recover for the same conduct. None of the other factors counsel against a finding of proximate cause here, either; the alleged damages are quantifiable to costs incurred and clients actually— not hypothetically—lost. *See Avandia*, 804 F.3d at 641 (considering whether the damages are speculative in nature). And Cardone alleges that the Defendants all knew Expotech was incapable of fulfilling the contract, yet ensured it was awarded anyways for their own personal gains, indicating plausibly alleging specific intent. *Id.* Accordingly, Cardone has standing to sue under RICO.

  2. Predicate Act

In order to state a valid claim under RICO, Cardone must preliminarily allege that Defendants committed an underlying predicate act of racketeering. Cardone alleges that Defendants violated Pennsylvania's bribery statute, *see* 18 Pa. Cons. Stat. Ann. § 4108 (a), (c), and federal law forbidding the transfer of converted funds over state lines, *see* 18 U.S.C. §§ 2314, 2315. Bribery qualifies as a predicate act under the statute. *See H.J. Inc. v. Northwestern Bell*, 492 U.S. 229, 250 (1989). Defendants devote much of their briefing to arguing that there was no plausible bribery or conversion. However, the Court already held that Cardone plausibly alleged both a bribery scheme and conversion. *See Expotech*, 2020 WL 1694543, at *10. The law-of-the-case doctrine thus settles this matter, *see Pharmacy Benefit*, 582 F.3d at 439. Thus,

Cardone has plausibly alleged the existence of a bribery scheme as the predicate act of its RICO claim.

    3. Section 1962(c)

Turning now to Cardone's allegation that Defendants violated Section 1962(c). This requires the plaintiff to show: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima*, 473 U.S. at 496. Defendants do not appear to challenge that Cardone has sufficiently alleged that "conduct" which requires that the defendants had "some part in directing" the racketeering affairs of the Enterprise. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 370-71 (3d Cir. 2010). Cardone alleges the personal involvement of all three Defendants in hatching and executing the bribery scheme. And as already discussed, bribery qualifies as racketeering. *H.J.*, 492 U.S. at 250.

    a. *Enterprise*

To have a viable RICO claim under Section 1962(c), Cardone must allege an "Enterprise" separate and apart from the Defendants themselves that conducted the racketeering. *Kehr*, 926 F.2d at 1411. RICO covers two types of enterprises. First are corporations, partnerships, and other legal entities. *Antitrust Litig.*, 618 F.3d at 364. Second, and relevant here, are "associations in fact," or "any union or group of individuals associated in fact although not a legal entity," including purely criminal entities. *Id.*; *United States v. Turkette*, 452 U.S. 576, 580-82 (1981). It "may be comprised only of defendants, or of defendants and non-defendants." *United States v. Urban*, 404 F.3d 754, 782 (3d Cir. 2005). The definition of an association in fact is expansive and intended to be read broadly. *Boyle v. United States*, 556 U.S. 938, 944 (2009). The association must, however, have at least three structural features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to

permit these associates to pursue the enterprise's purpose." *Id.* at 946.

Cardone alleges an association in fact existed between, at the least, Ghani, Expotech, Hosel, and Erica Monsivias, Expotech's office manager.[6] The Enterprise involved the bribery scheme, but also entailed a larger "referral network" of work amongst members of the Enterprise pre-dating its involvement with the CSA and the kickback scheme with the staffing agency Spright. According to Cardone, both legitimate business ventures and illicit criminal activity were encompassed by the association. *See Sedima*, 473 U.S. at 499 (noting that Congress wanted to reach both legitimate and illegitimate enterprises).

Cardone alleges a clear purpose for the Enterprise: exploiting business opportunities, legally and illegally, for the mutual financial benefit of all parties. Additionally, there is a relationship between the members. As described above, Cardone has alleged the members collaborated for each other's' benefits outside the context of the bribery scheme. They also worked together to provide "just enough legitimate services to keep the Project moving." And there is longevity; Hosel himself acknowledges having a business relationship with Ghani pre-dating the contract with Expotech, meaning the Enterprise plausibly existed for, at a minimum, longer than two years (the life of the CSA). This is longevity "sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946.

That decisions within the association "may be made on an ad hoc basis" and that the members do not have "fixed roles" does not impede the existence of an Enterprise. *Boyle*, 556 U.S. at 948. The RICO statute is intended to be "liberally construed to effectuate its remedial

---

[6] Although little detail about Monsivias' involvement is alleged, Cardone purports that she "facilitated the efforts of Hosel and Ghani to manipulate invoices and overbill Cardone." As Monsivias is not a named defendant, Cardone need not allege that she was an active and knowing participant in the bribery scheme, as the Enterprise exists separately from the underlying racketeering. Further, an enterprise can consist, in part, of non-defendants who were not involved in the alleged wrongful behavior. *See Urban*, 404 F.3d at 782.

12

purposes. *Id.* at 944. Thus, Cardone has alleged sufficient "evidence of an ongoing organization, formal or informal, and [] evidence that the various associates function as a continuing unit" to plausibly plead the existence of a RICO enterprise. *Id.* at 945.

### b. Pattern

Once an enterprise is established, the plaintiff must then show that it engaged in a *pattern* of racketeering activity. The statute defines "pattern" simply as requiring "at least two acts of racketeering activity, . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering." 18 U.S.C. § 1961(5). Thus, the outer limit for this showing is "broad indeed." *H.J.*, 492 U.S. at 237. There are two key takeaways from this definition. First, Congress clearly envisioned "circumstances in which no more than two predicates would be necessary to establish a pattern." *Id.* Second, Congress defined only the *minimum number of acts*; it "assumes that there is something to a RICO pattern beyond simply the number." *Id.* at 238. At its core, Congress envisioned a "natural and commonsense approach to RICO's pattern element in mind, intending a more stringent requirement than proof simply of two predicates, but also envisioning a concept of sufficient breadth that it might encompass *multiple predicates within a single scheme* that were related and that amounted to, or threatened the likelihood of, continued criminal activity." *Id.* at 237 (emphasis added). Thus, although showing two separate, similar schemes is the most common way of establishing a pattern, it can also be shown through one "open-ended scheme." *Shearin v. E.F. Mutton Grp., Inc.*, 885 F.2d 1162, 1166 (3d Cir. 1989).

The most important inquiries to determine pattern are "relatedness," "continuity," and a continued risk of harm. *Kehr*, 926 F.2d at 1412, 1417. But in light of the broadness of both those inquiries and the statute, the Third Circuit has identified additional factors to consider,

13

including "the number of acts, the length of time involved, the similarity of the acts, the number of victims, the number of perpetrators, and the nature of the activities." *Shearin*, 885 F.2d at 1166. The question in determining whether a pattern exists is whether the acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J.*, 492 U.S. at 240. Due to the fact-intensive nature of this issue, it is frequently an issue for a jury. *See Swistock v. Jones*, 884 F.2d 755, 758 (3d Cir. 1989).

Cardone alleges that Ghani, Expotech, and Hosel made continuous, separate bribe payments to Hosel in order maintain its wrongfully-awarded contract. Specifically, Cardone alleges that monthly bribery payments, the first one occurring on the same day as Cardone made its first monthly payment to Expotech, were made over the course of two years to Hosel. The payments "uniformly occurred shortly after Cardone made payments to Expotech, often on the same day as such payments." In sum, Hosel received approximately $1.2 million from Expotech during the life of the CSA. In return, Cardone alleges, Hosel and Expotech schemed to provide "just enough legitimate services to keep the Project moving." Additionally, Hosel allegedly worked with Expotech to drive up costs associated with the CSA that were passed along to Cardone at varying points throughout the life of the contract. According to Cardone, each separate bribe served to ensure Hosel's cooperation and execution of the scheme.

Relatedness here is clearly satisfied: the Third Amended Counterclaim alleges numerous acts of bribery related to the common purpose of ensuring Cardone continued to pay Expotech large sums of money for inadequate work. *See Kehr*, 926 F.2d at 1417 ("Since the complaint alleges numerous acts of mail fraud related to the common purpose of causing Kehr to default on its loans, the relatedness requirement is satisfied.").

Continuity, however, is more difficult. Cardone "may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *H.J.*, 492 U.S. at 242. Although proof of multiple schemes is "highly relevant" to continuity, it is not a "prerequisite." *Kehr*, 926 F.2d at 1412. Related acts "in furtherance of a single scheme can constitute a pattern if the acts constitute or present the threat of long-term continuous criminal activity." *Id.*

Cardone alleges acts that extended over two years on a highly regular basis. But all of these bribes went to the same person. While that alone is not a reason to hold there is no pattern, *cf. Swistock*, 884 F.3d at 758, it does warrant a closer review. In the mail fraud context, the Third Circuit observed that while relatedness will "nearly always" be satisfied when a party alleges at least two acts of mail fraud related to the same fraudulent transaction, continuity requires the Court to look "beyond the mailings and examine the underlying scheme or artifice. Although the mailing is the actual criminal act, the instances of deceit constituting the underlying fraudulent scheme are more relevant to the continuity analysis." *Kehr*, 926 F.2d at 1414. Thus the key question here is whether, looking beyond the length of time and consistency of the bribes, there is indication of risk that such racketeering behavior could extend beyond this one scheme.

The extent of Hosel and Ghani's purported business relationship thus becomes relevant. The allegation here is not, for example, that Ghani simply identified a weak link at Cardone who he could bribe to win the CSA. Instead, the allegation is that Ghani and Hosel worked together since at least 2012, engaging in numerous undisclosed business deals (as Hosel himself admits by attempting to explain the alleged bribe payments as payment for former deals he entered into

15

with Ghani). Additionally, the Counterclaim alleges actions that extend beyond the bribery scheme itself, including a kickback and referral program, whereby Hosel and Ghani covertly financially benefitted from the hiring of independent contractors for the CSA.

Finally, there is the matter of the multiple lawsuits Hosel's prior employers have filed against him. For example, when Hosel resigned from one of his past positions, he was sued for statutory violations, breach of contract, breach of fiduciary duty, and conversion related to Hosel's alleged appropriation of trade secrets, internet domains, and other marks. While "unsupported conclusions and unwarranted inferences" need not be accepted even at the motion to dismiss stage, *Maio*, 221 F.3d at 500, it is necessary to remain mindful that this motion is filed before Cardone has had the benefit of full discovery—and all *reasonable* inferences must be taken in its favor, particularly with regard to allegations about RICO patterns. *See Swistock*, 884 F.3d at 758 (noting that "in many cases plaintiffs will be able to withstand a facial attack on the complaint and have the opportunity to have their pattern allegations threshed out in discovery"). Thus while the Expotech Defendants are correct that the details of these suits are sparse, and none of them directly implicate Ghani or Expotech—it likewise remains noteworthy that Hosel's former employers, like Cardone, entered into contracts with Expotech while Hosel was employed there. And these allegations about the prior business dealings and lawsuits against Hosel thus must be considered in the broader context of the Counterclaim's allegations. That this is the third time Hosel has resigned from a job and then was sued by his former employer (and in at least two of those lawsuits, was sued for the same wrongdoings: breach of fiduciary duty and conversion) can give rise to a reasonable inference that both Hosel has engaged in job-related wrongdoing extending beyond this one incident and that lawsuits do not deter him.[7]

---

[7] In its brief, Expotech identifies an extensive list of highly specific facts that it claims Cardone should have alleged about the Expotech Defendants' and Ghani's ongoing relationship, and about Hosel's former employment, in order

16

Combined with Hosel and the Expotech Defendants' well-established long relationship with each other, and the two-year, multi-million dollar bribery scheme alleged in the instant case, this creates a reasonable inference, at the motion to dismiss stage, that there is a risk of continued criminal wrongdoing from the Enterprise. *Compare Swistock*, 884 F.3d at 757-59 (finding continuity requirement satisfied with respect to an alleged real estate fraud that lasted approximately one year and contained allegations of further misrepresentations by the defendants in regard to other potential transactions with the plaintiffs) *with Banks v. Wolk*, 918 F.2d 418, 422 (3d Cir. 1990) (finding no pattern when plaintiff's injury occurred during an eight-month period and the scheme was an attempt to "defraud a single investor of his interest in a single piece of real estate over a relatively short period of time"). Cardone has thus adequately alleged both a continuous and related scheme, such to satisfy the RICO pattern requirement and make a viable Section 1962(c) claim.[8]

4. Section 1962(d) Claim

Cardone next alleges that the Defendants entered into a conspiracy to violate RICO, pursuant to Section 1962(d). To state a plausible RICO conspiracy claim, a plaintiff must set forth "allegations that address the period of the conspiracy, the object of the conspiracy, and the certain actions of the alleged conspirators taken to achieve that purpose." *Shearin*, 885 F.2d at

---

to have a plausible claim, such as facts related to the specific value of contracts between Hosel's former employers and the exact work performed in them. These facts would certainly be relevant to *proving* Cardone's RICO claim. But at the motion to dismiss stage, the Court looks at the *plausibility* of *allegations* in the context of the Third Amended Counterclaim.

[8] The Expotech Defendants also argue that Cardone fails to allege a scheme that impacted interstate commerce, as required by RICO. RICO requires that the activity of the enterprise, not each predicate act of racketeering, must have some impact on interstate commerce. *Chambers Dev. Co., Inc. v. Browning-Ferris Indus.*, 590 F. Supp. 1528, 1535 (W.D. Pa. 1984). "The interstate requirement is de minimis[.]" *Shearin*, 885 F.2d at 1166. The Counterclaim alleges that the payments used to fund bribery scheme were transmitted across state lines, with Cardone transferring money from its Pennsylvania location to Expotech in Arizona, then Expotech making the bribery payments back from Arizona to Pennsylvania and New Jersey. Additionally, Cardone alleges that by failing to implement the CSA due to the bribery scheme, this impacted Cardone's interstate shipments and sales of good. This is all sufficient to satisfy the interstate commerce requirement. *See id.*

1166.

The period of the conspiracy is adequately alleged: Cardone alleges that, at the latest, the conspiracy began in 2015, when Expotech bribed Hosel for the CSA. *See id.* at 1167 (noting that the defendants "conducted their illicit scheme during the time of her employment . . . at the very least"). And the object of the conspiracy, to mutually benefit all Defendants through a bribery scheme to ensure the awarding of the CSA to Expotech, is likewise alleged. Finally, the Counterclaim alleges not just actions taken to achieve the purpose, but actual achievement of it. According to the Counterclaim, the bribery scheme successfully resulted in Expotech wrongfully being awarded the CSA and resulted in the incurring of additional costs above-and-beyond the initial contract price being imposed on Cardone. Cardone has plausibly alleged a RICO conspiracy.

### III. CONCLUSION

For the foregoing reasons, the Expotech Defendants' and Hosel's motions to dismiss shall be denied. An appropriate order follows.

**August 5, 2020**                                     **BY THE COURT:**

                                                        **/s/Wendy Beetlestone, J.**

                                                        _____
                                                        **WENDY BEETLESTONE**