**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **EXPOTECH ENGINEERING, INC.,**<br>        **Plaintiff,** | **CIVIL ACTION** |
| **v.** | |
| **CARDONE INDUSTRIES, INC.,**<br>        **Defendant/Counterclaim Plaintiff,** | **NO.  19-1673** |
| **v.** | |
| **EXPOTECH ENGINEERING, INC., ROD**<br>**GHANI AND MARSHALL HOSELL,**<br>        **Counterclaim-Defendants.** | |

## MEMORANDUM OPINION

Plaintiff Expotech Engineering, Inc. ("Expotech") sued Defendant Cardone Industries,

Inc. ("Cardone") for breach of contract following the breakdown of the parties' business

relationship.  In response, Cardone filed a multi-count counterclaim against Expotech and its

founder, Rod Ghani (collectively, the "Expotech Defendants"), as well as Cardone's former Vice

President of Finance, Marshall Hosel (collectively, "Defendants").  Cardone also separately filed

suit against Hosel.  It alleges, *inter alia*, a commercial bribery scheme whereby Ghani paid off

Hosel to ensure Expotech would be hired by Cardone for a technology services project.  The

parties now move for summary judgment on several of the outstanding claims and counterclaims,

and Cardone moves to preclude the testimony of the Expotech Defendants' proposed expert,

Shankar Venkataraman.

## I.    BACKGROUND

In 2016, Cardone—an auto parts manufacturer—hired Expotech to implement an

Enterprise Resource Planning system for the company.  Expotech performed work for Cardone

pursuant to the parties' agreement.  At some point, however, Cardone stopped paying Expotech for its services.

Those are the basic facts.  But the devil's in the details, and the details of this case are considerably more complicated.  The story begins in 1995, the year Ghani formed Expotech to perform services as an information technology ("IT") contractor and consultant.  Since its founding, Expotech has performed network engineering for the United States Department of Defense, implemented an enterprise system for American Eagle Brands, and performed hardware and software services for DC Johnson Enterprise, among other projects.

At some point, Expotech was hired by Safelite, an auto glass company, to complete a mobile technology project.  Safelite then hired Ghani for an in-house IT position.  There, Ghani met Hosel, whose role at Safelite was in distribution and logistics.  After a few years, Hosel left his job at Safelite for a position with Gerber Collison & Glass ("Gerber"), leading its retail auto glass business.  During Hosel's time at Gerber, the company's management sought help for a web services project.  Hosel introduced Ghani to Gerber's leadership team, and Expotech was hired to perform the work.

In 2012, Hosel began consulting for Cardone.  That same year, Hosel introduced Expotech to Cardone, and Cardone hired Expotech to consult on a data warehouse evaluation. The parties signed a Statement of Work ("SOW") on March 5, 2012 and Expotech completed its work on the project shortly thereafter.  That same year, Cardone hired Hosel as its Senior Vice President of Finance.

That much is undisputed.  The parties disagree, however, on what happened next. According to Defendants, at around the same time Expotech first contracted with Cardone, Ghani was advised that the Iraq Ministry of Oil was putting up for public bidding a contract to

create a fuel smart card system for the Oil Productions Distribution Company (the "Iraq Project").  Ghani testified that the Iraq Project was to consist of three phases with a total award of $240 million; the award for the first phase was approximately $7.5 to 8 million.  Ghani wanted to prepare a bid, and testified that he asked Hosel to help him with the pricing, financial modeling, and distribution side of the proposal.  He told Hosel that if the latter signed on to help with the project, Ghani would give Hosel a percentage of the award.  Expotech and Hosel later entered into a consulting agreement dated February 7, 2014, which stated that in exchange for business advisory and consulting services for the Iraq Project, Expotech would pay Hosel 20% of any award.  According to Hosel and Ghani, the two then worked together for a period of months to prepare the bid.

Later that year, Expotech was awarded the bid for Phase 1 of the Iraq Project.  But, according to Hosel, political instability in the region led to the Iraq Project being put on indefinite hold shortly after the contract was awarded.  Thus, Expotech never received any income related to the project.  Nevertheless, Hosel and Expotech executed a Promissory Note dated February 1, 2015, which acknowledged that under the consulting agreement, Expotech still owed Hosel a consulting fee of $1.5 million.  The Note requires Expotech to pay Hosel at least $40,000 every month until the principal and accrued interest were satisfied.

In 2015, Hosel reached out to Expotech to perform further consulting services for Cardone.  Cardone had, in 2014, entered into an agreement with SAP America, Inc., to provide Cardone with Enterprise Resource Planning ("ERP") software, services, and technology.  The endeavor was labeled ProjectOne, and was to be implemented in three phases with projected costs of over $20 million.  Cardone did not have the internal expertise to implement an ERP system, so it hired consulting firm Ernst & Young to implement Phase 1.

Shortly thereafter, Cardone named Hosel the Executive-in-Charge of ProjectOne. Dissatisfied with Ernst & Young's performance, Hosel hired Ghani and Expotech to provide a "second set of eyes on the project."  On July 15, Hosel executed a consulting agreement with Expotech on behalf of Cardone.  Expotech worked as a contractor for Cardone through the fall of 2015 and was paid a total of $507,285.42.  That same year, Expotech paid Hosel $50,729 and issued him an Internal Revenue Service Form 1099 for this amount.

 Cardone's contractors were, at the time, required to submit receipts documenting their claimed expenses.  On October 30, Ghani sent Hosel an email attaching two Expotech invoices to Cardone dated October 30.  Hosel did not send these invoices to anyone else at Cardone.  On November 10, Ghani sent Hosel an email with revised invoices, both still dated October 30, but with no indication that they were revised.  In contrast to the original invoices, the revised invoices showed: (1) a higher number of hours purportedly worked; (2) a lower amount of other expenses Expotech supposedly incurred; and (3) higher total invoice amounts.  Hosel approved the revised invoices for payment.

Meanwhile, in September of 2015, Cardone opened bidding for Phases 2 and 3 of ProjectOne.  Cardone began considering bids from other ERP implementers, including Cap Gemini, which was specifically requested to bid by Hosel.  Ghani informed Hosel that Expotech intended to submit a bid.  On November 18, Hosel submitted Expotech's final bid to Cardone's executives.  Four days later, Expotech gave a live bid presentation for Phases 2 and 3 to Cardone's executives and IT leads.  Expotech was ultimately awarded the project.

On February 1, 2016, Expotech and Cardone entered into a Consulting Services Agreement ("CSA") for implementing the remainder of ProjectOne.  Expotech then began working with Cardone's IT team to complete the SAP implementation.  Expotech's team for

ProjectOne was a mix of consultants, contractors, and employees of Expotech.  It used Spright Technologies, Inc. ("Spright"), a recruitment company, to hire consultants and contractors for its team.  Expotech introduced Cardone to Spright, and Cardone eventually hired people from Spright.  Each time Cardone would hire an employee directly from Spright, Cardone would pay Spright a commission of 20% of the employee's first-year salary, and Spright would pay Expotech a percentage of that commission.

Leading up to the "go-live" dates for Phases 2 and 3, ProjectOne team members realized there were problems with the implementation.  Nevertheless, Cardone went live with SAP in March 2018.  There were several issues with the launch and, approximately a week after the "go-live" date, Cardone decided to revert back to certain aspects of the old system.  Cardone failed to pay Expotech the remaining balance due for its work under the CSA, totaling approximately $1,050,000.  In mid-July, Expotech removed its consultants from Cardone.

Expotech filed this suit in 2019, alleging a single breach of contract stemming from Cardone's failure to pay.  Cardone filed a Counterclaim for breach of contract and, eventually amended its Counterclaim to add both Ghani and Hosel as Counterclaim Defendants.  It also separately filed suit against Hosel.  Cardone's Complaint and Counterclaim assert numerous claims against Defendants.  Following the denial of Defendants' motions to dismiss, *see Expotech Eng'g, Inc. v. Cardone Indus., Inc. (Expotech I)*, 2020 WL 1694543 (E.D. Pa. Apr. 7, 2020); *Expotech Eng'g, Inc. v. Cardone Indus., Inc. (Expotech II)*, 2020 WL 4504441 (E.D. Pa. Aug. 5, 2020), Defendants answered Cardone's pleadings and now move for summary judgment on several of Cardone's claims and counterclaims.  Cardone, in turn, moves for summary judgment as to three of its claims and counterclaims.  It separately moves, under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), to preclude the Expotech Defendants'

expert witness from offering expert testimony at trial.

## II.   THE SUMMARY JUDGMENT MOTIONS

The Expotech Defendants move for summary judgment on Cardone's counterclaims for unjust enrichment, declaratory judgment, conversion, RICO, conspiracy to violate RICO, civil conspiracy, and aiding and abetting breach of fiduciary duty.  Hosel moves for summary judgment on Cardone's claims for breach of contract and breach of fiduciary duty, as well as on Cardone's counterclaims for unjust enrichment, conversion, RICO, conspiracy to commit RICO, and civil conspiracy.  Because there is substantial overlap in the facts and arguments supporting Defendants' requests for dismissal, these two motions will be dealt with together.  Cardone's motion—seeking summary judgment on a breach of contract counterclaim and a declaratory judgment counterclaim against Expotech,[1] as well as a breach of contract claim against Hosel— will then be addressed.

### A.  Legal Standard

"[S]ummary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010) (citations and internal quotations omitted).  In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment."  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotations and alterations omitted).  "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof."  *Doe v. Abington Friends Sch.*, 480 F.3d 252,

---

[1] Cardone also asserts this breach of contract counterclaim against Ghani; however, Cardone does not seek summary judgment on its claim against Ghani at this time.

256 (3d Cir. 2007).

**B.  Defendants' Motions for Summary Judgment**

Many of Cardone's claims rest on the premise that the Expotech Defendants bribed Hosel in exchange for preferential treatment in relation to ProjectOne.  Thus, much of the parties' briefing is spent quarreling over whether disputed issues of material fact exist as to this alleged bribery scheme.  According to Defendants, the record is clear:  Expotech's payments to Hosel were for his work on the Iraq Project, and nothing more.  Because this issue is central to Defendants' arguments in support of summary judgment, it will be resolved first, before diving into the substantive claims.

**1.  The Alleged Bribery Scheme**

Upon review of the record, a disputed issue of fact exists as to whether Defendants engaged in a bribery scheme.

In 2015, Hosel hired Expotech on behalf of Cardone to perform consulting services with respect to Ernst & Young's work on ProjectOne.  He did so within weeks of being named Executive-in-Charge of ProjectOne.  That same year, Expotech paid Hosel exactly 10% of what Expotech invoiced Cardone under this consulting agreement.

Hosel then shared confidential information with Expotech during the bidding process for Phases 2 and 3 of ProjectOne, once he was aware of Ghani's interest in bidding on the project. A spreadsheet prepared by Expotech indicates, moreover, that it had access to the bidding information of all three bidders, allowing it to do a side-by-side comparison prior to submitting its own bid.  In 2016, the first payment Expotech made to Hosel came on the same day that Cardone made its first payment to Expotech under the CSA.  The payments Expotech made to Hosel were almost always made within a few days of Expotech receiving large payments from

Cardone pursuant to the CSA.  For example, on December 6, 2016, Hosel sent an email to Ian

Hinke of Cardone instructing Hinke to pay Expotech $688,050.12.  Two days later, Hosel

received two payments from Expotech in the amounts of $33,300.06 and $350,000.  All of these

payments were documented by Expotech on a spreadsheet, along with its accounting information

for ProjectOne.  The spreadsheet labels the payments to Hosel as "taxes."

Hosel also helped secure Cardone's contract with Spright (the "Spright-Cardone

Agreement"), pursuant to which Cardone agreed to pay Spright 20% of the base salary of each

individual who Cardone hired through Spright.  Under the side agreement between Expotech and

Spright, Spright paid Expotech a portion of the commission that Spright received from Cardone.

In a spreadsheet, Expotech listed five of the individuals hired pursuant to the Spright-Cardone

Agreement, their starting salary at Cardone, and the amount Spright paid to Expotech under their

agreement.  There is a cell in the spreadsheet labeled "For Marshal," with an amount to be paid

to him based on a formula of 33% of what Expotech received from Spright.  Over the course of

its relationship with Cardone, Expotech paid Hosel over $1.2 million.

This evidence raises a genuine issue of material fact as to whether the Expotech

Defendants bribed Hosel in connection with its work on ProjectOne; thus, whether Defendants'

alternate explanation for the alleged payments is credible must be determined by a jury.

## 2.  The RICO Claims

Hosel and the Expotech Defendants move for summary judgment on Cardone's RICO

counterclaims, which allege that the bribery scheme, along with other alleged misconduct,

violated Sections 1962(c) and 1962(d) of RICO.

### i.  Section 1962(c)

Section 1962(c) provides that it is "unlawful for any person employed by or associated

with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). To prove a violation of this provision, a plaintiff must show: "(1) the existence of an enterprise affecting interstate commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that the defendant participated, either directly or indirectly, in the conduct or the affairs of the enterprise; and (4) that he or she participated through a pattern of racketeering activity." *United States v. Parise*, 159 F.3d 790, 794 (3d Cir. 1998) (quoting *United States v. Console*, 13 F.3d 641, 652-53 (3d Cir. 1993)).

Defendants argue that the evidence does not support the presence of a RICO "enterprise" or a finding of "a pattern of racketeering activity."

a.   Enterprise

Up first is whether Cardone presents evidence of an "enterprise" sufficient to satisfy RICO's requirements.

"The statute does not specifically define the outer boundaries of the 'enterprise' concept but states that the term 'includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'" *Boyle v. United States*, 556 U.S. 938, 944 (2009) (quoting 18 U.S.C. § 1961(4)). Cardone alleges that Defendants acted as an association in fact, that is, as "a group of persons associated together for a common purpose of engaging in a course of conduct." *Id.* (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). In clarifying the attributes of an association-in-fact enterprise, the United States Supreme Court has held that "the RICO statute defines an 'enterprise' broadly, such that the 'enterprise' element of a § 1962(c) claim can be satisfied by

showing a 'structure,' that is, a common 'purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.'" *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 368 (3d Cir. 2010) (quoting *Boyle*, 556 U.S. at 946).

Cardone's allegations were previously found sufficient, at the pleading stage, to make out these structural features. *See Expotech II*, 2020 WL 4504441, at *5-6. With the benefit of discovery, the record now raises a genuine issue of material fact as to the existence of a RICO enterprise. The alleged "common purpose" of the enterprise is to "exploit[] business opportunities, legally and illegally, for the mutual financial benefit of all parties." *Id.* at *6. The evidence, in turn, raises a reasonable inference that Defendants did act with this common purpose and formed a relationship with longevity: Over a lengthy period the men made several business referrals to each other, a number of which resulted in business opportunities for Expotech, including the Gerber contract, the 2012 consulting agreement with Cardone, and the 2015 consulting agreement with Cardone. And as noted, there is a genuine issue of fact as to whether Hosel directly benefited from the Cardone referral in the form of bribery payments.

b. <u>Pattern of Racketeering Activity</u>

Defendants also challenge whether Cardone's evidence is sufficient to support a "pattern of racketeering activity" under the statute.

"A common thread running throughout § 1962 is that an injured party must demonstrate that the defendant was engaged in a 'pattern of racketeering activity.'" *Tabas v. Tabas*, 47 F.3d 1280, 1289-90 (3d Cir. 1995). "Racketeering activity" is defined to include various predicate acts listed in the statute. *See* 18 U.S.C. § 1961(1). To prove a "pattern" of racketeering activity, a plaintiff must show that the defendant committed at least two predicate acts of racketeering in a

ten-year period.  *Id.* § 1961(5).  This requirement, however, "concerns only the minimum number of predicates necessary to establish a pattern; and it assumes that there is something to a RICO pattern beyond simply the number of predicate acts involved."  *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 238 (1989) (emphasis omitted).  The statute thus "intend[s] a more stringent requirement than proof simply of two predicates, but also envision[s] a concept of sufficient breadth that it might encompass multiple predicates within a single scheme that were related and that amounted to, or threatened a likelihood of, continued criminal activity."  *Id.* at 237.

The illicit activity underlying Cardone's RICO claims is commercial bribery, which has previously been recognized as a predicate act under the statute and thus, if proven, would constitute racketeering activity.[2]  *See Expotech II*, 2020 WL 4504441, at *5; *see also H.J. Inc.*, 492 U.S. at 250.  Although Defendants dispute whether Cardone presents evidence of a predicate act, there is, as previously discussed, a genuine issue of material fact as to whether Defendants bribed Hosel in connection with ProjectOne.  Moreover, there is evidence of many predicate acts within a ten-year period:  Cardone has documented at least 23 payments from Expotech to Hosel between the years 2015 and 2018.  *See* 18 U.S.C. § 1961(5).

To establish a pattern, Cardone's evidence must also show both relatedness and continuity.  *H.J. Inc.*, 492 U.S. at 237-39.  "The test for 'relatedness' is broad."  *Banks v. Wolk*, 918 F.2d 418, 422 (3d Cir. 1990).  Predicate acts "are sufficiently related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."  *Id.* (quoting *H.J. Inc.*, 492 U.S. at 240).  Here, Cardone "alleges numerous acts of bribery related to the common

---

[2] Cardone notes that its RICO counterclaims are not based solely on bribery as a predicate act, but also allege violation of two federal statutes: 18 U.S.C. § 2314, relating to the transfer of stolen goods, and 18 U.S.C. § 2315, relating to the sale or receipt of stolen goods.  Neither party, however, elaborates on the applicability of these statutory provisions to the conduct alleged by Cardone.

purpose of ensuring Cardone continued to pay Expotech large sums of money for inadequate work," *see Expotech II*, 2020 WL 4504441, at *7, and substantiates these allegations with competent evidence.

The "continuity" requirement is more abstract.  The Third Circuit has "read the [RICO] legislative history's reference to 'continuity' as simply calling for an inquiry into the extent of the racketeering activity," *Marshall-Silver Constr. Co., Inc. v. Mendel*, 894 F.2d 593, 595 (3d Cir. 1990) (alteration in original) (quoting *Barticheck v. Fidelity Union Bank*, 832 F.2d 36, 40 (3d Cir. 1987)), and has articulated six factors as relevant to the analysis: "(1) the number of unlawful acts; (2) the length of time over which the acts were committed; (3) the similarity of the acts; (4) the number of victims; (5) the number of perpetrators; and (6) the character of the unlawful activity," *Swistock v. Jones*, 884 F.2d 755, 758 (3d Cir. 1989) (quoting *Saporito v. Combustion Eng'g, Inc.*, 843 F.2d 666, 676-77 (3d Cir. 1988)).  Due to the fact-intensive nature of this inquiry, it is often reserved for the jury.  *See Expotech II*, 2020 WL 4504441, at *7 (citing *Swistock*, 884 F.2d at 758).

To establish continuity, a plaintiff need not establish the existence of more than one "scheme" or more than one victim.  *See Mendel*, 894 F.2d at 595-97.  Rather, continuity is "both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Tabas*, 47 F.3d at 1292 (quoting *H.J. Inc.*, 492 U.S. at 241).  To establish close-ended continuity, the plaintiff must "prov[e] a series of related predicates extending over a *substantial* period of time." *Id.* (quoting *H.J. Inc.*, 492 U.S. at 242).  Although conduct lasting under a year is insufficient, *id.* at 1293, the Third Circuit has found that racketeering activity conducted over a period of 14 and 19 months meets the standard for closed-ended continuity, *see Swistock*, 884 F.2d at 759; *United*

*States v. Pelullo*, 964 F.2d 193, 209 (3d Cir. 1992).  In this case, although Defendants' alleged scheme involved only one victim, Defendants provide evidence that the alleged bribery payments extended from July 15, 2015 to February 5, 2018, a period of approximately two and half years.  Defendants have, moreover, identified 23 alleged bribes during this time period, consisting of sums ranging from tens to hundreds of thousands of dollars.

Cardone's evidence also allows the reasonable inference that there is a "threat of continuing RICO activity."  *See Hindes v. Castle*, 937 F.2d 868, 873 (3d Cir. 1991).  Ghani and Hosel had a relationship before the alleged bribery scheme, and Defendants offer evidence of communications between Ghani and Hosel from which a factfinder could infer that the two men were looking to pursue further ventures together.  In 2016, Hosel received an email from a headhunter about a position at PlanITROI which stated, among other things:  "[T]hey do plan on implementing an ERP system within the first year.  They are looking at Great Plains, Microsoft Dynamics, or something similar."  Hosel then forwarded the email to Ghani and wrote:  "Let's discuss.  Regardless of whether I pursue, this is a sales lead for you."  That same year, Hosel forwarded Ghani an email concerning Hosel's interest in a Chief Financial Officer position at Colony Hardware and wrote, "Take a look at this Company and let's discuss."

Defendants contend that these were just innocent business communications and referrals.  Fair enough.  However, if a jury were to find that Defendants engaged in racketeering activity while working at Cardone, it could also, based on this evidence, find a threat that Defendants might engage in further racketeering activity beyond their conduct at Cardone.

Because Cardone raises a genuine issue of material fact as to whether Defendants constitute an "enterprise" that engaged in a "pattern of racketeering activity," the Section 1962(c) counterclaims will proceed to trial.

### ii. Section 1962(d)

Section 1962(d) makes it illegal to conspire to commit a RICO violation. 18 U.S.C.

§ 1964(d). To make out a violation of this provision, a party must first establish "an endeavor

which, if completed, would satisfy all of the elements of a substantive [RICO] offense." *Ins.*

*Brokerage*, 618 F.3d at 373 (alteration in original) (quoting *Salinas v. United States*, 522 U.S. 52,

65 (1997)). Defendants argue that summary judgment on Cardone's Section 1962(d) claim is

appropriate, because Cardone fails to make out a Section 1962(c) claim. However, because

Cardone provides sufficient evidence for a jury to find a Section 1962(c) violation, the Section

1962(d) claim may proceed.

### 2. Declaratory Judgment

The Expotech Defendants move for summary judgment on Cardone's declaratory

judgment counterclaim, which seeks a judgment that Cardone is the owner of all work product

produced by Expotech under the CSA. This claim is discussed in detail in connection with

Cardone's summary judgment motion. For reasons discussed *infra*, material issues of fact exist

as to whether Cardone is entitled to a declaratory judgment in its favor on this claim.[3] Thus,

summary judgment on this claim will be denied.

### 3. The Breach of Contract Claims

Hosel seeks summary judgment on two of Cardone's breach of contract counterclaims.

One of these claims—concerning whether Hosel breached a severance agreement executed by

---

[3] The Expotech Defendants contend that Cardone's declaratory judgment claim should be dismissed as unripe. The Declaratory Judgment Act does require a "case of actual controversy" between the parties before a federal court may exercise jurisdiction. *See* 28 U.S.C. § 2201(a). An action for declaratory judgment is justiciable if: (1) the parties have adverse legal interests; (2) the facts are sufficiently concrete to allow for a conclusive legal judgment; and, (3) the judgment is useful to the parties. *Surrick v. Killion*, 449 F.3d 520, 527 (3d Cir. 2006). This Court applied these factors when deciding the Expotech Defendants' motion to dismiss and determined that Cardone's claim was justiciable, given Expotech's copyright application. *See Expotech I*, 2020 WL 1694543, at *7. Under the law-of-the-case doctrine, this issue is settled. *See In re Pharmacy Benefit Managers Antitrust Litig.*, 582 F.3d 432, 439 (3d Cir. 2009).

the parties—will be discussed below in connection with Cardone's summary judgment motion. For the reasons set forth *infra*, this breach of contract claim will go to a jury.

The second breach of contract claim involves a "Confidentiality, Non-Competition, and Non-Solicitation Agreement" executed by Hosel and Cardone on May 3, 2017 ("May 2017 Agreement"). Section 1(b) of that Agreement provides:

> During the term of [Hosel's] employment with Cardone and for as long as such information shall remain Confidential Information or Trade Secrets of Cardone, [Hosel] will not use or disclose to any person or entity, without Cardone's prior written consent, any Confidential Information or Trade Secrets of Cardone, whether prepared by [Hosel] or others, except in the course of [Hosel's] employment with Cardone and in furtherance of Cardone's business.

Cardone contends that Hosel breached this provision by forwarding Ernst & Young's bid information for Phases 2 and 3 of ProjectOne to Expotech.

Hosel does not dispute that he forwarded the bidding information to Expotech, nor does he dispute that this information constituted "confidential information" under the May 2017 Agreement. However, he argues that he forwarded this information to Expotech "in the course of [his] employment with Cardone and in furtherance of Cardone's business." He contends that he was sending the information to Expotech in its capacity as a consultant to Cardone, charged with overseeing Ernst & Young's work on Phase 1 of ProjectOne. Hosel notes that at that point, Cardone had not yet opened up bidding for the final phases of ProjectOne, and Expotech had yet to be considered for or approved as a bidder for the implementer position.

But as discussed above, there are genuine issues of material fact as to whether Hosel did in fact forward this information to Ghani and Expotech "in furtherance of Cardone's business," or whether he did so to help secure Expotech the bid for ProjectOne and thus secure a personal benefit for himself. Summary judgment on this claim will therefore be denied.

15

### 4.  The Fiduciary Duty Claims

Defendants also seek summary judgment on Cardone's fiduciary duty claims.  Cardone sues Hosel for breach of fiduciary duty, and sues the Expotech Defendants for aiding and abetting Hosel's breach of fiduciary duty.

Starting first with the claim against Hosel, a breach of fiduciary duty occurs where: (1) an employee negligently or intentionally fails to act in good faith and solely for the benefit of the employer in all matters for which he or she was employed; (2) the employer was injured; and, (3) the employee's failure to act solely for the employer's benefit was a real factor in bringing about the employer's injuries.  *Colgate-Palmolive Co. v. Tandem Indus.*, 485 F. App'x 516, 518 (3d Cir. 2012).  In deciding Hosel's motion to dismiss, the Court determined that Cardone's breach of fiduciary duty claim against Hosel would survive to the extent it arises from the alleged bribery scheme.  *Expotech I*, 2020 WL 1694543, at *15.  Hosel now tries to defeat this claim at summary judgment, arguing that Cardone fails to present sufficient evidence of a bribery scheme.  However, because there are issues of fact as to whether Expotech's payments to Hosel were legitimate, this claim will proceed to trial.

Same for Cardone's aiding and abetting claim.  To establish aiding and abetting breach of fiduciary duty, a party such show: (1) a breach of fiduciary duty owed to another; (2) knowledge of the breach by the aider and abettor; and, (3) substantial assistance or encouragement by the aider and abettor in effecting the breach.  *Chicago Title Ins. Co. v. Lexington & Concord Search & Abstract, LLC*, 513 F. Supp.2d 304, 318 (E.D. Pa. 2007).  Like Hosel, the Expotech Defendants argue that Cardone fails to support its bribery allegations; however, the record contains sufficient evidence from which a reasonable jury could find that Expotech bribed Hosel to obtain the CSA.

16

The Expotech Defendants further contend that there are no facts in the record suggesting that Ghani knew of Hosel's alleged breach of fiduciary duty. However, the record contains evidence from which reasonable factfinder could conclude that the Expotech Defendants knew that they were making payments to Hosel at a time when Hosel was an executive at Cardone and tasked with overseeing ProjectOne and Expotech's work. Both fiduciary duty claims survive summary judgment.

### 5. The Unjust Enrichment, Conversion, and Civil Conspiracy Claims

Next, Defendants seek summary judgment on Cardone's counterclaim for unjust enrichment. To succeed on a claim for unjust enrichment, a party must prove that: (1) benefits were conferred on one party by another; (2) the recipient appreciated such benefits; and, (3) the benefits were wrongfully secured such that it would be inequitable or unjust for them to be retained without payment of value. *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 447 (3d Cir. 2000). Defendants argue that to the extent this claim is premised on Cardone's bribery allegations, it cannot succeed. But as discussed, Cardone presents evidence from which a factfinder could reasonably find that Expotech and Ghani paid Hosel to secure the CSA.

Cardone also presents evidence from which a factfinder could conclude that Hosel worked with the Expotech Defendants to inflate certain Expotech invoices that Hosel then approved for payment. For example, on October 30, 2015, Ghani sent Hosel an email attaching two Expotech invoices. Hosel did not send these invoices to anyone else at Cardone. On November 10, Ghani sent Hosel an email with revised invoices with higher total invoice amounts. The email did not contain any indication that these invoices were revised. Hosel forwarded the revised versions of the invoices to another Cardone employee, stating "Approved for payment. Project ONE cost center." From this, a jury could reasonably infer that Defendants

"wrongfully secured" a benefit from Cardone which it would be inequitable for them to retain. Thus, the unjust enrichment claims will proceed.

So too must Cardone's conversion and civil conspiracy claims. Conversion is "the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification." *Brown & Brown, Inc. v. Cola*, 745 F. Supp.2d 588, 622 (E.D. Pa. 2010). Defendants again argue that this claim must fail, because Cardone's bribery allegations are unsupported. But because whether the Expotech Defendants bribed Hosel is a jury question, this claim move forwards.

Finally, a claim for civil conspiracy "requires that two or more people conspire to do an unlawful act." *McGreevy v. Stroup*, 413 F.3d 359, 371 (3d Cir. 2005). To succeed on a civil conspiracy claim, a party must establish an underlying tort. *Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 405 (3d Cir. 2000). Cardone presents evidence sufficient to support its tort claims, and a factfinder could reasonably determine from this evidence that Ghani and Hosel conspired together to commit the underlying torts.

Accordingly, Defendants' motions will be denied in their entirety.

### C. Cardone's Motion

#### 1. Breach of Contract Against Expotech

Cardone first seeks summary judgment on one of its two breach of contract counterclaims against Expotech. Specifically, it seeks judgment on its claim that Expotech breached the CSA by obtaining and attempting to enforce a copyright over the software developed by Expotech in connection with ProjectOne. To state a claim for breach of contract, Cardone must establish: (1) the existence of a contract; (2) a breach of a duty imposed by the contract; and, (3) resultant

damages.[4]  *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003).  Neither party disputes

that the CSA constitutes a binding and enforceable contract.  The primary issue is whether there

has been a breach and, if so, by whom.

But first, some claim-specific background.  Cardone's breach of contract claim arises

from Section 10 of the CSA, which provides:

> [Expotech] agrees that such information, work product, and other results, systems
> and information developed by [Expotech] and/or Client in connection with such
> Consulting Services (hereinafter referred to collectively as the "Work Product")
> shall, to the extent permitted by law, be a "work made for hire" within the definition
> of Section 101 of the Copyright Act (17 U.S.C. § 101), and shall remain the sole
> and exclusive property of Client.  To the extent any Work Product is not deemed to
> be a work made for hire within the definition of the Copyright Act, [Expotech] with
> effect from creation of any and all Work Product, hereby assigns, and agrees to
> assign, to Client all right, title and interest in and to such Work Product, including
> but not limited to copyright . . . . [Expotech] also agrees to waive any and all moral
> rights relating to the Work Product, including but not limited to, any and all rights
> of identification of authorship.

In September 2018, after Expotech had removed its consultants from Cardone,

Expotech's counsel sent a cease and desist letter to Cardone regarding the software created by

Cardone in connection with ProjectOne, software that is still used by Cardone to this day.

Expotech then registered a copyright in certain software patches and coding (the "copyrighted

software"), and sued Cardone for copyright infringement based on Cardone's continued use of

the copyrighted software.  This suit was eventually dismissed for lack of personal jurisdiction.

Cardone argues that Expotech's copyright registration violates Section 10 of the CSA,

which indicates that any "work product" or "results, systems and information" created by

Expotech in connection with ProjectOne would be considered "work made for hire," and thus the

"sole and exclusive property" of Cardone.  Moreover, Section 10 provides that if Expotech's

---

[4] As with the parties' previous motions, the substantive tort law of Pennsylvania will be applied in deciding this diversity action.

work product is not considered "work made for hire," Expotech agrees to "assign" Cardone "all right, title and interest in and to such Work Product, including but not limited to copyright." Cardone contends that Expotech's assertion of ownership over the software violates the clear language in the CSA stating that the software is the property of Cardone.

In response, Expotech contends that Cardone materially breached the CSA first, such that Expotech is the owner of any software developed after Cardone's breach.[5]  Specifically, it argues that Cardone materially breached the CSA by failing to pay Expotech a "holdback payment" due on February 21, 2018.  After this date, Expotech alleges that it continued to create software, and when several forbearance agreements between the parties did not help Expotech get paid, it filed a copyright registration and infringement claim "expressly restricted" to just the software patches and coding Expotech created after the alleged breach.

A party "may not insist upon performance of the contract when he himself is guilty of a material breach of the contract." *LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 560 (Pa. 2009) (quoting *Ott v. Buehler Lumber*, 541 A.2d 1143, 1145 (Pa. Super. 1988)).  But if "the breach is an immaterial failure of performance, and the contract was substantially performed, the contract remains effective." *Widmer Eng'g, Inc. v. Dufalla*, 837 A.2d 459, 467 (Pa. Super.

---

[5] Expotech also argues that Section 10 of the CSA does not apply to the software developed for ProjectOne.  It asserts that the software cannot be deemed "work made for hire" under the Copyright Act, 17 U.S.C. § 101.  Section 101 defines "work made for hire" as "a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101(2).  Expotech argues that the software patches and coding developed by Expotech in discharging its obligations under the CSA do not fit within any of these nine categories of work.  Courts have, however, "held that computer programs used together as a software system qualify as 'compilations' or 'collective works' within the meaning of § 101(2)." *See Stanacard, LLC v. Rubard, LLC*, 2016 WL 462508, at *8 (S.D.N.Y. Feb. 3, 2016); *see also Siniouguine v. Mediachase Ltd.*, 2012 WL 2317364, at *5 (C.D. Cal. June 11, 2012) (computer programs "qualify as 'works made for hire' under Section 101(2) because they are both 'contributions to a collective work' and 'compilations'").  In any event, as Expotech itself concedes, even if the copyrighted software is not considered "work made for hire," the CSA contains a safety net clause requiring Expotech to assign its ProjectOne material to Cardone.

2003).  A breach is material when it goes "to the essence of a contract."  *Norfolk S. Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 92 (3d Cir. 2008).  Generally, the question of whether an alleged breach is "material" is reserved for the jury.  *Int'l Diamond Imps., Ltd. v. Singularity Clark, L.P.*, 40 A.3d 1261, 1272 (Pa. Super. 2012).

The evidence here shows that, on February 21, 2018, Cardone failed to make a payment required under the CSA.  The evidence also shows that Expotech affirmatively agreed to extend payment and that Cardone did in fact continue to make payments to Expotech after this date, in an amount totaling approximately $3.5 million.  In the end, however, Cardone failed to pay Expotech approximately $1,050,000.  The "essence" of the parties' contract was that Cardone would pay Expotech to implement an ERP system.  A jury might therefore determine that Cardone's failure to pay for Expotech's services in February 2018 constituted a material breach of the CSA.  Of course, a jury might also determine that Cardone substantially performed its obligations under the parties' agreement by continuing to make partial payments under the contract.  Ultimately, however, this issue is for a factfinder to determine.

Cardone does not persuade otherwise.  It first appears to contend that because it did make some payments to Expotech after the February 2018 default, the original default could not have been a material breach.  That may be so.  However, Cardone does not cite any authority that would allow the Court to assess the accuracy of this proposition.  Cardone also points to language in the CSA stating that the provisions of Section 10 will "survive the termination" of the CSA.  In other words, this provision appears to require that, in the event the CSA is terminated, the work product created by Expotech pursuant to the CSA remains the property of Cardone.  This provision does not, however, speak to any work product created by Expotech *following* a material breach of the CSA.

Finally, Cardone seeks to distinguish Expotech's authority.  Expotech does rely on numerous cases standing for the proposition that, in the event of a material breach, the non-breaching party has a right to suspend performance or rescind the contract.  *See, e.g.*, *In re Gen. DataComm Indus., Inc.*, 407 F.3d 616, 623-24 (3d Cir. 2005) ("[I]f an Eligible Executive breached one of those provisions, it would excuse the future performance of DataComm.").  Cardone argues that this scenario is factually distinct from the one here, where Expotech continued to perform under the contract after Cardone's alleged breach and did not seek rescission.  However, "the law does not require immediate termination, especially where a party's conduct does not amount to acceptance of the breach." *Orion Drilling Co., LLC. v. EQT Prod. Co.*, 826 F. App'x 204, 213 n.15 (3d Cir. 2020).  Because factual disputes remain as to whether Cardone materially breached the CSA, this claim will proceed to trial.[6]

### 2.  Declaratory Judgment

Cardone contends that it is entitled to a declaratory judgment that it is the owner of any software and work product produced by Expotech under the CSA.  However, a declaratory judgment would be premature at this stage, given that there are material issues of fact concerning which party breached the CSA first and whether that breach was material.  Cardone's request will therefore be denied.

### 3.  Breach of Contract Against Hosel

Finally, Cardone moves for summary judgment on its breach of contract claim against

---

[6] Expotech also argues that Cardone's breach of contract claim must fail, because Cardone does not establish damages.  Cardone's damages claim is based on the attorneys' fees and costs it incurred to defend Expotech's copyright registration and infringement action.  Expotech contends that attorneys' fees are not normally recoverable as damages.  However, "a party may recover losses that are incidental to the breach of contract," including attorneys' fees, where those fees were incurred in an effort to "ward off Defendants' breaches, such as the cost to defend a wrongfully-brought foreclosure case, or the cost to set aside a wrongfully-instituted sheriff's sale." *DeHart v. HomEq Servicing Corp.*, 47 F. Supp.3d 246, 256 (E.D. Pa. 2014).  Thus, if a jury were to find that Expotech's copyright registration and infringement action were wrongful, Cardone might be entitled to certain fees and costs incurred in defending against this conduct.

Hosel.  In this claim, the relevant contract is a Severance Agreement between Cardone and

Hosel, which both parties agree is valid and enforceable.  Their dispute concerns whether Hosel

breached the Agreement's provisions.

Hosel ended his employment with Cardone in 2018.  On September 24, 2018, he and

Cardone executed the Severance Agreement and Release.  As relevant here, the Severance

Agreement provides that:

> Cardone has agreed to the terms of the release of claims set forth in Section 3(a)
> above in reliance on certain representations of [Hosel] intended to induce Cardone
> to provide such release of claims.  [Hosel's] representations are as follows: (A) a
> representation that during his employment with Cardone and to the present date
> [Hosel] has not received any remuneration or benefits, directly or indirectly, from
> ExpoTech, Inc., its affiliates, and/or their officers, employees or representatives
> including, but not limited to, Rod Ghani, Chief Executive Officer of ExpoTech,
> Inc. (collectively referred to as the "ExpoTech Parties"), and that [Hosel] will not
> receive any remuneration or benefits, directly or indirectly, from the ExpoTech
> Parties due, in whole or in part, to any services rendered by ExpoTech to Cardone,
> and (B) a representation that Employee has fully complied with the terms of the
> May 2017 Agreement.

The Severance Agreement further provides that, in the event of a breach, Hosel would be

required to return to Cardone certain funds paid to Hosel pursuant to the Agreement.

The parties do not dispute that while Hosel was employed by Cardone, Expotech

transferred at least $1,247,765 from its bank accounts to Hosel's bank account.  Cardone argues

that these funds constituted the sort of "remuneration or benefits" barred under the Agreement.

Hosel, on the other hand, argues that because these funds were related to Hosel's work on the

Iraq Project, rather than Expotech's work on ProjectOne, they were not "due, in whole or in part,

to any services rendered by ExpoTech to Cardone."

"Pennsylvania contract law begins with the 'firmly settled' point that 'the intent of the

parties to a written contract is contained in the writing itself.'"  *Bohler-Uddeholm Am., Inc. v.*

*Ellwood Grp., Inc.*, 247 F.3d 79, 92 (3d Cir. 2001) (quoting *Krizovensky v. Krizovensky*, 624

A.2d 638, 642 (Pa. Super. 1993)).  "Courts do not assume that a contract's language was chosen

carelessly, nor do they assume that the parties were ignorant of the meaning of the language they

employed."  *Great Am. Ins. Co. v. Norwin Sch. Dist.*, 544 F.3d 229, 243 (3d Cir. 2008) (quoting

*Murphy v. Dusquesne Univ.*, 777 A.2d 418, 429 (Pa. 2001)).  When a contract's terms are clear

and unambiguous, "the meaning of the contract is ascertained from the contents alone."  *Mace v.

Atl. Refining Mktg. Corp.*, 785 A.2d 491, 496 (Pa. 2001).  If a contract is clear, it should be

interpreted by the court.  *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir.

2009.  But "[i]n circumstances where the language chosen by the parties is ambiguous, deciding

the intent of the parties becomes a question of fact for a jury."  *Id.*  A contractual provision will

be deemed "ambiguous" if it is "subject to more than one reasonable interpretation when applied

to a particular set of facts."  *Norwin*, 544 F.3d at 243 (quoting *Murphy*, 777 A.2d at 429).

Here, Hosel's primary argument in support of his preferred interpretation of the

Severance Agreement is premised on a blatant misquoting of the provision at issue.  Hosel

construes the provision as follows:

> Cardone has agreed to the terms of the release of claims set forth in Section 3(a)
> above in reliance on certain representations of [Hosel] intended to induce Cardone
> to provide such release of claims.  [Hosel's] representations are as follows: (A) a
> representation that during his employment with Cardone and to the present date
> [Hosel] has not received any remuneration or benefits, directly or indirectly, from
> ExpoTech, Inc., its affiliates, and/or their officers, employees or representative
> including, but not limited to, Rod Ghani, Chief Executive Officer of ExpoTech,
> Inc. (collectively referred to as the "ExpoTech Parties"), and that [Hosel] will not
> receive any remuneration or benefits, directly or indirectly, from the ExpoTech
> Parties**,** due, in whole or in part, to any services rendered by ExpoTech to Cardone
> . . . .

Hosel erroneously inserts just a single comma prior to the phrase "due, in whole or in part, to any

services rendered by ExpoTech to Cardone," but it is a crucial piece of punctuation:  If this

qualifying phrase were in fact separated from its antecedents by a comma, then it would be

reasonable to find that the phrase was intended to modify all antecedents, rather than only the immediately preceding antecedent. *See Stepnowski v. Comm'r of Internal Revenue*, 456 F.3d 320, 324 (3d Cir. 2006) ("[W]here there is a comma before a modifying phrase, that phrase modifies all of the items in a series and not just the immediately preceding item."). In other words, if the comma existed, then, according to Hosel, his contractual representations would be that: (1) he did not receive payment from the Expotech Defendants while he was employed with Cardone due to the services Expotech performed for Cardone; and (2) he will not receive any payments from the Expotech Defendants in the future due to the services that Expotech performed for Cardone.

Unfortunately for Hosel, this comma does not exist. Cardone thus cites to a rule of statutory construction—the last antecedent rule—for the proposition that, by its clear terms, the qualifying phrase "due, in whole or in part, to any services rendered by ExpoTech to Cardone" modifies just the immediately preceding antecedent. The last antecedent rule provides that "all phrases and sentences are to be construed according to the rules of grammar; and these require as a general thing, a limiting clause or phrase, following several expressions to which it might be applicable, to be restrained to the last antecedent." *Midboe v. State Farm Mut. Auto. Ins. Co.*, 433 A.2d 1342, 1347 (Pa. 1981) (citations and internal quotations omitted). Because in this case, the qualifying phrase is not preceded by a comma, Cardone argues that the plain and unambiguous representations by Hosel are that: (1) he did not receive payment from the Expotech Defendants while he was employed by Cardone; and (2) he will not receive payments from the Expotech Defendants in the future due to the services that Expotech performed for Cardone. And because it is undisputed that Hosel did receive payment from the Expotech Defendants while he was employed by Cardone, it argues that he breached the Severance

25

Agreement.

Hosel did not seek leave to reply to this argument, nor has he sought to correct his misrepresentation to the Court.  Nevertheless, the Court cannot agree with Cardone that this contractual provision is clear and unambiguous.  As noted, Cardone wants to read clause (A) of the above-quoted provision as listing two distinct representations: (1) a representation that Hosel did not receive money from the Expotech Defendants during his time at Cardone; and (2) a representation that Hosel will not receive money from the Expotech Defendants in the future in connection with Expotech's work for Cardone.  Cardone's interpretation appears to be premised on a different comma, namely, the comma separating the phrases "that during his employment with Cardone and to the present date [Hosel] has not received any remuneration or benefits, directly or indirectly, from ExpoTech, Inc., its affiliates, and/or their officers, employees or representative including, but not limited to, Rod Ghani, Chief Executive Officer of ExpoTech, Inc. (collectively referred to as the "ExpoTech Parties")" and "that [Hosel] will not receive any remuneration or benefits, directly or indirectly, from the ExpoTech Parties."  Cardone asks the Court to interpret this comma as inserted by the parties to distinguish these phrases as separate representations.  But clause (A) expressly states that Hosel is making "*a* representation," not multiple representations.  Cardone's interpretation of the separating comma is inconsistent with this language; thus, the Court cannot say with certainty that the parties included the separating comma with the intention of denoting two distinct representations.  And if the separating comma is not given the effect desired by Cardone, clause (A) could also be reasonably read as requiring a single representation that Hosel has not and will not receive payment from the Expotech Defendants in connection with Expotech's work for Cardone.  Because the contractual language is ambiguous, and because factual issues remain as to whether Hosel did in fact accept money

from Expotech and Ghani in relation to ProjectOne, Cardone's breach of contract claim will need to be decided by a jury.

## III.   CARDONE'S *DAUBERT* MOTION

Finally, Cardone moves under Federal Rule of Evidence 702 to preclude the Expotech Defendants' proposed expert, Shankar Venkataraman, from offering certain expert opinions and testimony at trial.

### A.  Legal Standard

The Federal Rules of Evidence govern the admission of expert opinions in a federal case. *Daubert*, 509 U.S. at 587-89.  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

This rule "embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit."  *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). Qualification requires "that the witness possess specialized expertise."  *Id.*  To be reliable, the expert's opinion must be premised on more than mere "'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief."  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994) (quoting *Daubert*, 509 U.S. at 590).  Finally, the expert's testimony must "fit" the case at hand, that is, "must be relevant for the purposes of the

27

case and must assist the trier of fact." *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (quoting *Schneider*, 320 F.3d at 405).  When a party challenges an expert's opinions pursuant to Rule 702, the proffering party bears the burden of demonstrating by a preponderance of the evidence that the opinions of its proposed expert are admissible.  *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 417-18 (3d Cir. 1999).

The proffering party is not, however, required to "carry the burden of proving to the judge that the expert's assessment of the situation is correct."  *United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004) (quoting *Ruiz-Troche v. Pepsi Cola Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)); *see also Paoli*, 35 F.3d at 744 ("The grounds for the expert's opinion merely have to be good, they do not have to be perfect.").  Trial courts must act as gatekeepers to ensure the relevance and reliability of all expert testimony, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999), but this gatekeeping obligation "is not intended to serve as a replacement for the adversary system," Fed. R. Evid. 702, advisory committee's note.  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### B.  Discussion

Before diving into the merits of Cardone's motion, some background.  The parties have alleged two breach of contract claims not raised in the present summary judgment briefing.  Expotech asserts against Cardone a breach of contract claim alleging that Cardone breached the CSA by failing to pay Expotech the balance due under the CSA.  In response, Cardone asserts a breach of contract counterclaim against the Expotech Defendants alleging, *inter alia*, that Expotech breached the CSA by failing to implement the ERP system as contractually required.

To support its allegations concerning Expotech's technical and logistical failures, Cardone identified two technical experts who produced expert reports, affidavits, and other supporting documentation.  These experts are Kevin McManus, a former Cardone employee, and Eric Kimberling, a consultant.  Cardone contends that both men have extensive expertise in the technical aspects of ERP implementation.

Expotech did not offer an affirmative expert report, but retained Venkataraman as a rebuttal expert.  Venkataraman served as Expotech's project manager for ProjectOne and was then hired by Cardone to, among other things, maintain and monitor Cardone's ERP system. Venkataraman signed two declarations, one purporting to rebut the opinions of McManus and the other purporting to rebut the opinions of Kimberling.

Cardone now seeks to preclude Venkataraman from offering expert opinions and testimony on the following subjects: (1) Cardone's financial condition; (2) Cardone's business planning and decisions, including those related to Cardone's Mexico plant and AutoZone; (3) McManus's personal motivations in offering expert testimony in this matter; (4) IT infrastructure and server capacity; (5) the SAP solution manager tool; and, (6) SAP's escalation closure report, prepared by SAP to assess the ERP system's issues after the "go-live" in March 2018.

In response, the Expotech Defendants clarify that they do not intend to offer Venkataraman as an expert on the first four of these subjects.  Thus, Cardone's motion to preclude Venkataraman from providing expert testimony on these matters will be granted as unopposed.[7]

---

[7] Cardone argues that the Court should reject the Expotech Defendants' attempt to characterize Venkataraman's opinions on these subject matters as lay opinions under Federal Rule of Evidence 701.  Again, however, the Expotech Defendants have represented that they will not be presenting Venkataraman as an expert witness on these subjects.  Whether Venkataraman's opinions on these matters are admissible as lay witness testimony is not the proper subject of a *Daubert* motion.

The Expotech Defendants do, however, seek to offer Venkataraman as an expert on SAP implementation, including the SAP solution manager tool and SAP's escalation closure report. They contend that Shankar is qualified to opine on these matters, given his training and professional experience planning, implementing, managing, and troubleshooting SAP and other ERP systems.  However, they offer no argument at all as to whether Venkataraman's opinions on these subjects are reliable or fit the facts of this case, as required to meet *Daubert*'s standard for admissibility.  They bear an affirmative duty to do so.  *Padillas*, 186 F.3d at 417-18 (proffering party bears burden of demonstrating by preponderance of the evidence that proposed expert's opinions are admissible).  Because the Expotech Defendants fail to meet their burden of establishing that Venkataraman's opinions on the SAP solution manager tool and SAP's escalation closure report are admissible as expert opinions, Cardone's motion to preclude Venkataraman from testifying as an expert on these matters will be granted.

## IV.    CONCLUSION

In sum, this matter is replete with factual disputes that will need to be assessed and decided by a factfinder.  Thus, the parties' summary judgment motions will be denied in their entirety.  Cardone's *Daubert* motion will, however, be granted.

An appropriate order follows.

**August 25, 2021**                                              **BY THE COURT:**

                                                                **/s/Wendy Beetlestone, J.**
                                                                _____
                                                                **WENDY BEETLESTONE, J.**